WILLIAM McLANEY, J. H. BUCHANAN, MIAMI NATIONAL BANK AND S. A. RIZZO, APPELLANTS, *v.* FORTUNE OPERATING CO., INC., DBA SILVER PALACE, HAROLD C. SPRINGSTON, MICHAEL BORNSTEIN, DAVID PEARL AND ANTHONY DiMAGGIO, RESPONDENTS.

No. 5459

August 21, 1968                    444 P.2d 505

*Denton & Monsey,* of Las Vegas, and *Bible, McDonald, Carano & Wilson,* of Reno, for Appellants.

*Foley, Garner & Shoemaker,* of Las Vegas, for Respondent Fortune Operating Co., Inc.

*Calvin C. Magleby,* of Las Vegas, for Respondents Springston, Bornstein, Pearl and DiMaggio.

## OPINION

By the Court, COLLINS, J.:

This appeal is from a judgment entered by the court below in which three cases were consolidated for trial. We conclude the judgment to be in error, reverse it and remand the consolidated actions for a new trial in accordance with this decision.

The three cases below are:

Case No. A 15523 a suit by Harold C. Springston against Fortune Operating Co., Inc. for $35,000, the balance due upon a promissory note;

Case No. A 17657 a suit by Springston in a representative capacity pursuant to NRCP 23(a) on behalf of himself and other creditors seeking a judgment for damages against Fortune and William McLaney for failing to comply with Nevada's Bulk Sales Act (NRS 98.010–98.050);

Case No. A 22056 an action by Michael Bornstein, David Pearl and Anthony DiMaggio against Fortune Operating Co., Inc., dba The Carousel Club and Melvin Axler, Sam Brechner, J. H. Buchanan, and William McLaney seeking to have Fortune and Axler permanently enjoined from transferring the assets of Fortune to Buchanan and McLaney and to have the sales agreement between them declared null and void.

The trial judge rendered the findings of fact, conclusions of law and on the major points entered judgment in favor of respondents. This appeal is from that judgment.

The judgment declared void the sale and transfer to

McLaney of the business of Fortune Operating Co. and the furniture and fixtures. It ordered McLaney to reconvey those assets to Fortune or in the alternative, if reconveyance could not be had, to pay damages to Springston for $35,000; to Bornstein for $41,000; to Pearl for $33,801; to DiMaggio for $24,750. It also awarded plaintiffs costs and an attorneys fee of $25,000.

The court later allowed Miami National Bank, S. A. Rizzo and J. Cason Ives to intervene as creditors of McLaney. Their claim was rejected. They appeal from that order.

The lower court found the following facts:

Springston, Bornstein, Pearl, and DiMaggio owned respectively 160, 170, 140, and 100 shares of common stock in Fortune Operating Company.

On April 1, 1964 Springston entered into an agreement with Fortune selling his 160 shares of stock for $55,000 of which $10,000 was paid down with the balance of the purchase price to be paid in installments; Springston deposited his stock certificates and promissory note in escrow; Fortune is in default on the note in the sum of $35,000.

On May 27, 1964 Bornstein, Pearl and DiMaggio entered into an agreement for the sale of their 410 shares of stock to Fortune; each received 10 percent of the purchase price as a down payment with the balance of the price to be paid in installments; Fortune defaulted in the payments and failed to cure the default within 10 days as required by the agreement. Each of these parties elected under the agreement to declare the unpaid balance of the purchase price payable immediately.[1]

The trial court found that Melvin Axler, an officer purporting to act as president of Fortune, on October 12, 1964 entered into a letter agreement with McLaney and Buchanan for the sale of Fortune; on November 14, 1964 a formal agreement was entered into with McLaney to buy the business, furniture and fixtures of Fortune; on November 14, 1964 Fortune supplied McLaney a certificate of passage of a resolution at a stockholders and directors meeting of Fortune held October 12, 1964 for the purpose of voting on the proposed sale of all

---

[1]The evidence shows, though not found as a fact by the lower court, that one Mac Robbins, who owned 500 shares of Fortune stock, entered into an agreement with Melvin Axler, an officer of Fortune, for sale of his stock. He too received a down payment from Axler with the balance of the purchase price to be paid in installments. Axler defaulted in performance of this contract. Robbins joined initially as a plaintiff with Bornstein, Pearl and DiMaggio but later dismissed his action.

of the assets of Fortune to McLaney; no notice of the stockholders meeting was given to Bornstein, Pearl, DiMaggio, or Springston, nor did they waive notice of the meeting.

The only stockholders present at the meeting were Sam Brechner and Melvin Axler holding 170 shares and 660 shares respectively of the 1,900 issued and outstanding shares of Fortune.

Springston, as a creditor of Fortune, received no notice of the bulk sale of Fortune's business, furniture and fixtures to McLaney.

The court further found that under the escrow agreements Springston's voting rights of the stock of Fortune were suspended but that the voting rights of stock sold by Bornstein, Pearl and DiMaggio were not suspended because of Fortune's default in payment of installments due them.

From these facts the lower court concluded that the meeting of October 12, 1964 was not a properly constituted stockholders meeting as required by NRS 78.565; that Springston, Bornstein, Pearl, and DiMaggio were entitled to notice of the stockholders meeting because the default of Fortune in the stock sales agreement with Springston, Bornstein, Pearl, and DiMaggio terminated the suspension of their voting rights; and that Springston, Bornstein, Pearl, and DiMaggio were entitled to a judgment requiring McLaney to reconvey all the assets of Fortune acquired by the sale back to it or in the alternative, if the reconveyance was impossible, then to the money judgments detailed above.

After McLaney acquired Fortune's assets, he transferred them to Clanebach, Inc., a Nevada corporation, in which he held a stock interest. Clanebach borrowed $425,000 from Miami National Bank. This loan was secured by Fortune's lease on the Silver Palace (Club Carousel) and a chattel mortgage on its furnishings and equipment. Clanebach borrowed another $100,000 from S. A. Rizzo and J. Cason Ives which was secured by a second assignment of the lease and chattel mortgage on the equipment. These lenders were allowed to intervene after judgment but their claim that rescission of the contract was impossible and that only Fortune was liable was rejected by the lower court.

While the parties make many contentions and urge many issues,[2] we think the decisive issues are these:

---

[2]Respondents also urge the timeliness of filing of notice of appeal by appellants and renew their motion to dismiss the appeal. We considered that motion and denied it and also denied a further petition for rehearing.

(1) Were Springston, Bornstein, Pearl, and DiMaggio voting shareholders of record and thus entitled to notice of the October 12, 1964 meeting?[3]

(2) What is the effect of Nevada's Bulk Sales Act on the parties?

(3) Were Miami National Bank and Rizzo entitled to intervene as permitted by the lower court?

(4) Is there any theory upon which Buchanan can be held liable?

(1) If Springston, Bornstein, Pearl, and DiMaggio were stockholders entitled to vote on October 12, 1964 they were entitled to notice of the meeting which they failed to receive. See NRS 78.370 and 78.565. The question is whether the agreement for the sale of their stock to Fortune had relinquished or suspended their voting rights at the time of that meeting. We conclude their rights were suspended; that they were not entitled to notice; and therefore the 830 shares of stock voted by Axler and Brechner at the meeting satisfied the requirement of NRS 78.565.

The Springston-Fortune agreement contained the following provision: "Upon execution of this Agreement for Purchase of Stock, Springston does hereby relinquish his voting rights in connection with the 160 shares of stock that he owns, and does hereby assign those voting rights and all incidents in connection therewith, to the Corporation."

There was nothing in the Springston agreement requiring a return of the stock in the event of Fortune's default. The parties specifically agreed that this 160 shares could not be voted. Respondents urge that Springston was nevertheless entitled to notice of the meeting because of the requirements of NRS 78.370. That contention is incorrect because he was not a stockholder of record entitled to vote.

---

[3]The parties discuss at length the effect of Robbins' sale of his 500 shares of stock of Fortune to Axler (see note 1, supra). This requires no decision by us. The lower court made no findings on that issue. It apparently concluded that because the 830 shares voted by Axler and Brechner at the October 12 meeting did not constitute a majority of the voting shares required at a meeting called for the purpose of selling or leasing all the corporate assets. NRS 78.565. Therefore there was no necessity for it to decide the Robbins stock question. Furthermore, if the stock rights owned by either Robbins or the Bornstein-Pearl-DiMaggio group were not entitled to be voted, the 830 shares voted by Axler-Brechner would satisfy the requirements of NRS 78.565.

We likewise conclude that the Bornstein-Pearl-DiMaggio stockholders rights were suspended. They were neither entitled to notice of the meeting nor the right to vote their 410 shares.

The sales agreement between them and Fortune provided: "(b) Should FORTUNE default * * * the entire unpaid balance remaining unpaid at such time shall immediately become due and payable with accrued interest, and upon demand, escrowee be, and it is hereby directed to deliver to sellers all stock held by it in escrow as hereinabove set forth, and all moneys paid to sellers shall be retained by them as liquidated damages." After a 10-day period of default, required by the contract, the sellers had alternative remedies of either (1) declaring the entire balance of the purchase price due and payable immediately; or (2) the sellers could keep the payments already received as liquidated damages and demand a return of their stock certificates. Notwithstanding use of the word "and" between those remedy clauses we hold that they are in the alternative and not the conjunctive. Otherwise there would be a forfeiture of the buyer's rights. Unless such a result is expressed it will not be allowed by the courts of this state. Clark v. London Assurance Corp., 44 Nev. 359, 195 P. 809 (1921). We are fortified in this conclusion by the trial court's finding that respondents *"elected"* to and did declare the entire unpaid balance due * * * and payable * * *."

Next respondents contend that a demand by them addressed to the escrow agent for return of their stock certificates upon Fortune's default was not a condition precedent to restoration of their suspended shareholders rights. We do not agree. The contract of the parties itself required such demand. We will not give to the agreement a strained construction. The plain unambiguous meaning of the parties own words control. Thus the election of remedies by sellers was made when they communicated their demand to the escrow agent.

Similarly, if the cumulative remedy theory urged by respondents was adopted it would render meaningless another provision of the parties contract. That provision reads: "5. During the period in which the Escrowee holds the shares of stock and assignments thereof in escrow, and as long as Fortune performs the terms and conditions of this Agreement on its part to be performed, the right to vote the said shares of stock so held in escrow is suspended and for these purposes and the purpose of voting said shares of stock * * * the said shares of

stock * * * shall be deemed Treasury stock and shall be considered as having been retired by Fortune." There were two prior conditions necessary before the voting suspension would terminate. Not only must there have been a default by Fortune but the shares of stock must no longer be held by the escrow agent.

Respondents concede none of them made any express demand upon the escrow agent for return of their stock. The only notice of default communicated by any of the respondents was a letter from Bornstein's counsel to Fortune. It was dated October 9, 1964, called for acceleration of the payments (not return of the stock) and recognized the buyer had 10 days within which to correct the default. The critical meeting was held 3 days later on October 12, while the stock still reposed in custody of the escrow agent as Treasury stock.

Because of the erroneous conclusion of the trial court that Bornstein, Pearl and DiMaggio were entitled to notice of the October 12 meeting and the right to vote their shares, it ordered McLaney to reconvey all the assets he acquired back to Fortune, or if reconveyance was not possible then money damages were adjudged. The court's decree did not spell out what circumstances made reconveyance of the assets impossible. This invites further dispute and itself would cause us to remand the action for retrial. The sale was not void ab initio. Rather it was voidable at best. If properly rescinded by election of a stockholder or creditor entitled to that remedy, provisions should have been made by the lower court for restoration of the parties to the same situation in which they were when the contract was made. Any consideration or advantage secured by either party must be surrendered. Solorza v. Park Water Co., 195 P.2d 523, 529 (Cal.App. 1948).

(2) While there were no findings of fact or conclusions by the lower court on the effect of the bulk sales law on the parties (NRS 98.010 to 98.050) we feel the issue demands resolution by the lower court upon retrial of these causes. The record shows McLaney relied upon a list of creditors supplied to him under oath by Fortune. There is no evidence in the record of McLaney's bad faith. Absent bad faith, McLaney had every right to rely upon the correctness of the list of creditors supplied to him under those conditions and cannot be held liable to those not listed. Georgia Excelsior Co. v. Hartfelder-Garbutt Co., 78 S.E. 611 (Ga.App. 1913); Highway Signs & Servicing Co. v. Scott, 8 P.2d 391 (Kan. 1932); Brecht Co. v. Robinowitz, 275 S.W. 213 (Tex.App. 1925). Bornstein, Pearl

and DiMaggio were not listed as creditors, therefore McLaney cannot be held responsible to them absent bad faith on his part.

Likewise, though there is considerable evidence in the record of waiver of rights under the bulk sales law by creditors of Fortune, the trial court made no mention of such circumstances in its findings and conclusions. We think this issue likewise needs resolution upon retrial.

As to Springston, McLaney did have notice of his claim against Fortune. His position, however, is subordinate to the other creditors listed. Robinson v. Wangemann, 75 F.2d 756 (5 Cir. 1935). Nor can Springston's recovery against McLaney be allowed to exceed the market value of the goods and property purchased (not the leasehold interest) by McLaney. NRS 98.040. This determination of value requires a finding by the lower court. None appears in the record before us.

(3) The lower court allowed Miami National Bank and S. A. Rizzo to intervene in the above action subsequent to the trial and after judgment. The motion to intervene came too late and should have been denied. NRS 12.130; Ryan v. Landis, 58 Nev. 253, 74 P.2d 1179 (1938).

(4) Finally it appears that the judgment against Buchanan must be reversed. He participated, if at all, only in the preliminary negotiations. He was not a party to the final agreement of sale between Fortune and McLaney. He is not named in the trial court's judgment except in the caption, nor in the notice of entry of judgment. Tacit conduct of the real parties in interest in these causes indicate he is an innocent man in the street.

Accordingly the judgment in the consolidated causes is reversed and the matters remanded for a new trial consistent with this opinion.

THOMPSON, C. J., ZENOFF, BATJER, and MOWBRAY, JJ., concur.