130 N.J. Super. 141 (1974)
325 A.2d 838
POYDAN, INC., A NEW JERSEY CORPORATION, SPRINGFIELD STEAK HOUSE, A NEW JERSEY CORPORATION, AND FRANK BALDAN, PLAINTIFFS,
v.
AGIA KIRIAKI, INC., A NEW JERSEY CORPORATION, AAA IMPORTERS LIMITED, A NEW JERSEY CORPORATION, NICHOLAS PROTOPAPAS, CONSTANTINE ZAVOLAS, NIKITAS PROTOPAPAS, JOHN ZAVOLUS AND JOHN PROTOPAPAS, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
September 24, 1974.
*142 Mr. Donald W. Rinaldo, attorney for plaintiffs (Mr. Louis M. Minotti, appearing).
Mr. Edward N. Stiso, Jr., attorney for defendants Constantine Zavolas and John Zavolas.
*143 Messrs. Rusignola & Pugliese, attorneys for defendants Nicholas Protopapas, Nikitas Protopapas and John Protopapas (Mr. Carmen Rusignola appearing).
Mr. Sanford Silverman, attorney for defendant AAA Importers, Limited.
FULOP, J.S.C.
This action raises out of a series of transactions dealing with a restaurant known as the Springfield Steak House situated on Route 22 in Springfield Township, Union County, New Jersey.
Plaintiff Poydan, Inc., a New Jersey corporation, owned the real property used by the restaurant. Springfield Steak House, a New Jersey corporation, owned the liquor license and the personal property and operated the restaurant. Both corporations were under the control of Frank Baldan, who was the equitable or principal owner of the stock.
On or about November 18, 1969 plaintiffs jointly agreed to sell the real and personal property, liquor license and restaurant to five individual defendants, Nicholas Protopapas, Nikitas Protopapas, John Protopapas, Constantine Zavolas and John Zavolas for $500,000, plus the value of the inventory. The contract provided for transfer of the assets to two corporations to be formed by the buyers. As it turned out the buyers formed only one corporation, named Agia Kiriaki, Inc. (hereinafter Agia Kiriaki) and took all of the assets in that corporation. The purchase price was to be paid partly in cash, partly by assumption of an existing mortgage, and partly by a purchase money note payable to Poydan, Inc., one of the sellers. The note was for $250,600. It was secured by the following:
1. A real estate mortgage dated June 10, 1970 from Agia Kiriaki, Inc. to Poydan, Inc.
2. A security agreement covering the personal property in the restaurant, made June 10, 1970 by Agia Kiriaki, Inc. to Springfield Steak House, Inc.
*144 3. The pledge to Springfield Steak House, Inc., Poydan Inc. and Frank Baldan of all of the issued and outstanding shares of stock of Agia Kiriaki, Inc.
The individual purchasers as well as the corporation formed by them were co-makers of the note, and became jointly and severally liable thereon.
The contract of November 18, 1969 contained the following, among other provisions:
4. The Buyers shall likewise enter into a buy and sell agreement whereby in the event any of the said Buyers desires to terminate his activity with the businesses herein named that the corporate stock so held by such terminating stockholder shall be first offered to the remaining stockholders or the corporation and the by-laws shall further provide that in the event none of said stockholders desire to purchase said stock that then and in that event the corporation may purchase same if it receives the prior written consent of Seller which shall not be unreasonably withheld. If neither the said stockholders or the corporation want to purchase the proferred stock or are able to purchase same, said stock may then be purchased by Seller or its main stockholder, Frank Baldan, but by no other person or entity of any kind whatsoever. The intent of the parties hereto is that as long as the Buyers are indebted to Seller and Operator that no persons strangers to the corporation shall be entitled to become stockholders of either of said corporations.
A rider dated November 22, 1969 provides:
9. Buyers represent that they will constitute the only stockholders of the corporation that will be formed by them provided however, that it is agreed by the Seller and Operator and the Buyers that one additional stockholder may be admitted providing that such additional stockholder is a blood relative of Constantine Zavolas.
A written agreement executed on June 10, 1970, at the closing of title, expressly continued these provisions of the contract and rider in effect after the closing.
In the mortgage note of June 10, 1970 it is provided:
4. Notwithstanding the foregoing, the unpaid balance of the principal sum of this note and interest hereon shall immediately become due and payable, at the election of the holder hereof, in the event of:

* * *
c. Any change in the ownership of the mortgaged property; * * *
*145 In the pledge agreement of June 12, 1970 it is provided:
* * * further that they will not severally, jointly or otherwise sell, assign, transfer, pledge or hypothecate any of said stock or any interest therein, nor suffer nor permit same to be pledged, assigned or hypothecated unless and until this agreement has been fully performed and the Promissory Note fully paid.
In the security agreement covering goods and chattels, dated June 10, 1970, it is provided:
2.2 Debtor is the owner of the collateral free of any other lien or security interest and will not sell, exchange, lease or otherwise dispose of the collateral, nor permit any person other than Secured Party to acquire a lien or security interest therein or file a financing statement covering the collateral.

* * *
4. DEFAULT. Debtor shall be in default under this agreement upon the occurrence of any of the following:

* * *
4.2 BREACH OF AGREEMENT BY DEBTOR. Failure by Debtor to keep, observe or perform any provision of this agreement.
On October 12, 1973 the five stockholders of Agia Kiriaki, Inc. entered into an agreement with defendant AAA Importers, Limited, a New Jersey corporation, (hereinafter AAA) to sell their stock in Agia Kiriaki, Inc. to AAA for $675,000. The attorney for the buyers drafted the agreement for the sale. Prior to execution of the agreement the attorney for the sellers inserted page 3 (a) therein, which was agreed to by all parties. It included the following provisions:
7. (a) Notwithstanding anything hereinabove set forth the parties hereto do agree as follows:
A. The issued stock mentioned in Paragraphs 1 (a) and (b) hereof has been pledged in connection with the mortgage mentioned in Paragraph 1 (d) hereof in the amount of approximately $264,000.00, the pledgee being Poydan, Inc., and said stock certificates are presently in the possession of one Donald W. Rinaldo, attorney for said Poydan, in escrow, pending payment of the aforesaid mortgage and said stock may have been further pledged to Dr. Allen, the holder of the mortgage in the original amount of $125,000.00, also mentioned in paragraph 1 (d) hereof. In lieu of the physical delivery of the stock *146 certificates owned by the Sellers the Sellers will individually execute assignments of said certificates and will direct a letter to said Donald W. Rinaldo, Esq. authorizing him to turn over the said stock certificates to the Buyer herein upon the payment of the aforesaid mortgage in the approximate amount of $264,000.00 and will further direct a letter to the subsequent pledgee of said stock certificates of the same import.
The sale to AAA was consummated. Sixty percent of the stock of AAA was held by George O'Brien and Michael Daspin. Forty percent of the stock of AAA was immediately sold to Constantine Zavolas and John Zavolas, two of the sellers of the Agia Kiriaki stock. This was done secretly so that none of the other sellers knew about it at the time. However, Constantine and John Zavolas are minority stockholders, have ceased to be active in the operation of the restaurant, and have no control over the assets mortgaged to plaintiffs.
Plaintiffs seek a judgment for the balance remaining unpaid on the note. They seek an injunction against the payment of the balance of the purchase price by AAA to the sellers until plaintiffs' note has been paid in full.
It appears that AAA has been paying the installments on the note as they fell due. There is no evidence of any default in any term or condition of the instruments held by plaintiffs unless it be by the sale of the stock of Agia Kiriaki to AAA.
Plaintiffs contend that the sale of the shares of stock in violation of the provisions of the contract with plaintiffs constitutes a default which permits plaintiffs to accelerate the due date of the balance.
Defendants contend that:
1. The provision against sale of the pledged stock until and unless the debt to plaintiffs is fully paid is invalid under N.J.S.A. 12A:9-311 of the Uniform Commercial Code.
2. The instruments held by plaintiffs nowhere provide for acceleration upon breach of the terms of the contract *147 as to sale of the collateral, and the covenants and conditions of the contract are independent.
3. The acceleration would constitute a forfeiture not favored by equity.
The first contention is plausible and appears to be supported by the New Jersey Comment to N.J.S.A. 12A:9-311 of the Uniform Commercial Code. The comment says that the section "declares void any provision in the security agreement either prohibiting transfer or making the transfer constitute a default."
However, the statute does not say that such provisions are void. It provides that such contractual provisions shall be ineffectual to prevent a voluntary or involuntary transfer of the debtor's equity in collateral. The statute has been construed to mean that the transferee from the debtor acquires title in the equity subject to the terms of the secured transaction documents, and the rights of the secured creditor are not affected by the transfer of the debtor's equity. If the security agreement provides that the transfer shall constitute a default, the secured creditor may enforce the same.
In American Bar Association, Uniform Commercial Code Handbook (1964), at 400, in an article by Professor William E. Hogan of the Cornell Law School, originally printed in 47 Minn. L. Rev. 205 (1962) and again in Coogan, Hogan and Vagts, Secured Transactions under the Uniform Commercial Code, it is said:

B. Prohibition on Transfer by the Debtor and Default
The Code also recognizes the debtor's interest in the collateral and provides that this interest may be reached by creditors or may be voluntarily transferred by the debtor "notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default." The quoted language should in no way impede the secured party's right to proceed to enforce his interest in the collateral after the voluntary or involuntary transfer. The only purpose of this reference to default is to assure that even if the transfer is a default, the transferee obtains some rights. In no sense does the language prevent the secured party from proceeding *148 to enforce his interest because such a transfer constitutes a default. The only impediment to enforcement by the secured party after this kind of transfer will come from other Code rules protecting third parties.
In 69 Am. Jur.2d, Secured Transactions, § 211, it is said:
The Uniform Commercial Code clarifies pre-Code law by providing that the debtor's rights in collateral may be voluntarily or involuntarily transferred by way of sale, creation of a security interest, attachment, levy, garnishment, or other judicial process, notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default.[1]
[1] It is fairly implied by the language of Uniform Commercial Code § 9-311 that the security agreement may provide that a transfer by the debtor is a default. See Report No. 2 of the Permanent Editorial Board for the Uniform Commercial Code. p. 218. * * *
If a security agreement contains such a provision concerning voluntary or involuntary transfer by the debtor, the provision will be enforced only to the extent that it makes such transfer an event of default. It is clear that both the debtor himself may transfer his interest in the collateral and that his creditors may also take appropriate action to reach his interest. The rights of creditors of the debtor or any transferee, with respect to the collateral, are subject to the rights of the secured party to the extent provided in the various "priority" provisions of the Uniform Commercial Code.
Also see First National Bank of Bay Shore v. Stamper, 93 N.J. Super. 150 (Law Div. 1961); Farrow v. Ocean County Trust Co., 121 N.J.L. 344 (Sup. Ct. 1938).
The general understanding of the Bar, as shown by form books and printed forms in common use, supports the same view.
There does not appear to be any sound reason for invalidating without exception all provisions in security agreements which forbid the transfer of the collateral or make such transfer a default. A mortgagee or other secured lender has an interest in the identity of his debtor. Even though the security may be adequate, an unreliable owner may allow it to deteriorate or even remove or conceal some thereof.
*149 In the present case a large part of the value of the assets constituting the security depends upon the continuance of a valid liquor license and the successful carrying on of the restaurant business on the premises. An unsuitable, irresponsible or dishonest purchaser may lose the license and/or destroy or "milk" the business, leaving an empty shell. It was not unreasonable for the creditors to reserve the right to determine whom they will accept as their debtor in possession of the security.
The second argument of defendants is that the papers do not provide for the acceleration of the debt upon breach of the agreement not to sell the corporate stock. The contention is technical and incorrect. The note secured by the real estate mortgage, by the security agreement covering personalty and by the pledge of stock provides for acceleration of the due date of the unpaid balance of the note in the event of "Any change in the ownership of the mortgaged property; * * *."
In the circumstances of this case the shares of stock were part of the property mortgaged. In any event, the intent was that the transfer of the collateral to the control of any human beings other than the Zavolases and the Protopapases should entitle the creditors to call the note. This intent is written large over the entire transaction and was understood by all of the parties. It was also made clear to the principals of AAA, who indicated their understanding that the mortgage note would have to be paid at or about the closing of title.
A court of equity always looks to the substance, not to the form. Fortugno v. Hudson Manure Company, 51 N.J. Super. 482 (App. Div. 1958); Kleinberg v. Schwartz, 87 N.J. Super. 216 (App. Div. 1965), aff'd 46 N.J. 2 (1965). In Grieco v. Grieco, 38 N.J. Super. 593 (App. Div. 1956), the court said:
* * * equity never permits a rigid principle of law to smother the factual realities to which it is sought to be applied. In equity you *150 cannot tune out the relevant static and undertones. Equity adapts its relief to the requirements of the particular case. * * *
The acceleration of a mortgage debt by reason of the failure of the mortgagor to perform the terms of the contract is not a penalty or forfeiture disfavored in the law or in equity. Weiner v. Cullens, 97 N.J. Eq. 523 (E. & A. 1925); Bohland v. Horn, 107 N.J. Eq. 570 (E. & A. 1930); Glorsky v. Wexler, 142 N.J. Eq. 55 (Ch. 1948); Kaminski v. London Pub. Inc., 123 N.J. Super. 112 (App. Div. 1973).
I conclude that plaintiffs have the right to accelerate the due date of the unpaid balance of the debt and to require payment thereof.
Judgment will be entered in favor of plaintiffs and against all of the defendants.