UNITED INDEPENDENT INSURANCE AGENCIES, INC., a
Hawaii corporation, Plaintiff-Appellant, v. BANK OF HONO-
LULU, Defendant-Appellee, and MARIO R. RAMIL, Receiver of
Financial Security Insurance Company, Intervenor on Appeal

NO. 9569

(CIVIL NO. 69203)

APRIL 7, 1986

BURNS, C.J., HEEN AND TANAKA, JJ.

## OPINION OF THE COURT BY TANAKA, J.

This is an appeal by plaintiff United Independent Insurance Agencies, Inc. (UIIA) from a summary judgment in favor of defendant Bank of Honolulu (Bank). The crucial legal question in the case is whether the sellers or the purchaser of all of the shares of stock of UIIA's parent corporation, Federated Insurance Agency, Inc. (Federated), which had been pledged by the sellers to Bank, had the right to vote those shares. We hold that because the record discloses a genuine issue of material fact determinative of the legal question, the lower court erred in granting the summary judgment.

## I. FACTS

### A. *Pre-Complaint Facts*

The following facts are not in dispute. In 1974, Paul I. Brown (Brown) and other investors incorporated Federated, a general insurance agency. On February 11, 1977, as Federated's president, Brown entered into an agreement to acquire UIIA, another general insurance agency. Subsequently, Federated's board of directors ratified the agreement and authorized Brown to negotiate a loan from Bank to finance the acquisition. Brown successfully negotiated a 90% United States Small Business Administration (SBA) guaranteed loan of $330,000 with

Bank.

On March 14, 1977, Bank, Federated, and Federated shareholders Brown, Richard H. Arimizu (Arimizu), Charles E. McGee (McGee), and Arthur E. Harris (Harris) executed various documents regarding the $330,000 loan.[1] The documents included collateral pledge agreements whereby Federated, as borrower, pledged 100% of the acquired shares of UIIA stock and the Federated shareholders, as guarantors, pledged their respective shares of Federated stock, constituting 100% thereof, to Bank to secure the $330,000 loan. The certificates evidencing the ownership of all 3,180 shares of UIIA stock and all 2,000 shares of Federated stock, indorsed in blank by the respective owners, were delivered to Bank. Each collateral pledge agreement included, *inter alia,* the following provisions:

6. VOTING RIGHTS. For the term of this agreement Pledgor shall have the right, where applicable, to vote securities on all corporate questions, but, at Pledgee's request, Pledgor shall execute due and timely proxies in favor of Pledgee for this purpose.

\* \* \*

13. NO TRANSFER OF PLEDGOR'S INTEREST. Pledgor shall not in any way sell, transfer, diminish, or encumber its interest in said collateral, and any attempt to so sell, transfer, diminish, or encumber shall be invalid and without effect, and shall constitute a default hereunder.

Unbeknownst to Bank, on December 5, 1980, Brown, Arimizu, and Harris (collectively Sellers)[2] executed a "Stock Purchase Agreement" (Purchase Agreement) with Robert J. Keller (Keller). The Purchase

---

[1] Federated Insurance Agency, Inc. (Federated) executed the following documents: (1) Loan Agreement; (2) Promissory Note; (3) Collateral Pledge Agreement (United Independent Insurance Agency, Inc. (UIIA) stock being the collateral); (4) Security Agreement; and (5) Uniform Commercial Code (UCC) - Financing Statement.

Federated's shareholders, Paul I. Brown (Brown) (1,200 shares), Richard H. Arimizu (Arimizu) (500 shares), Charles E. McGee (McGee) (200 shares), and Arthur E. Harris (Harris) (100 shares), executed the following documents: (1) Small Business Administration Guaranties; (2) Promissory Note as endorsers; (3) Collateral Pledge Agreements (their shares of Federated stock as collateral); and (4) UCC - Financing Statements.

[2] Sometime prior to December 5, 1980, Brown had acquired McGee's 200 shares of Federated stock. Consequently, McGee was not a party to the December 5, 1980 Stock Purchase Agreement.

Agreement provided for the acquisition by Keller or his nominee, Imperial Holdings, Inc. (Purchaser),[3] from Sellers of (1) "all of the capital stock, issued and outstanding, of Federated," which owned 100% of the issued and outstanding stock of UIIA, and (2) the capital stock of three other related corporations.[4] The consideration was $20.00 and the assumption by Purchaser of a $25,000 debt of Sellers to UIIA. The Purchase Agreement expressly subordinated the sale to

[t]he rights of the Bank of Honolulu with respect to the stock of Federated and UIIA which is pledged to said bank under a Small Business Administration loan.

On February 25, 1981, the closing of the sale occurred. At that time, each Seller signed a blank stock power form. Subsequently, on a date undisclosed in the record, Purchaser installed its set of directors and officers for Federated and UIIA thereby replacing the Sellers' set.

In December 1981, Bank learned of the sale of the Federated stock to Purchaser and that Brown was no longer a director and officer of Federated and UIIA. On December 18, 1981, Bank gave written notice to Keller and Federated that (1) Federated was in default of the loan because of a number of reasons including the sale of the Federated stock which violated the collateral pledge agreements, (2) the entire balance of the loan was being accelerated, and (3) $228,000 of UIIA's checking account at Bank was being frozen until the matter was resolved.[5]

On December 30, 1981, in response to Bank's suggestion, Sellers and McGee met in Bank's boardroom with Bank's representatives and attorneys and an SBA representative. In chronological sequence, special meetings of Federated's stockholders, its directors, UIIA's stock-

---

[3]In the Amendment to Stock Purchase Agreement dated January 22, 1981, Keller designated his wholly owned Hawaii corporation, Imperial Holdings, Inc., as the Purchaser.

[4]The related corporations were United Insurance Management, Inc. (UIMI) (100% owned by Brown); PAR, Inc. (100% owned by Brown, Arimizu, and Harris); and Financial Security Insurance Co., Ltd. (51.93% of its capital stock owned by UIMI, UIIA, and Brown).

[5]Federated was not in default as to its monthly installment payments. The December 18, 1981 letter stated that the loan balance was "$213,923.60 together with interest after January 1, 1982[.]"

holders, and its directors were held. The minutes of those meetings indicate the occurrence of the following: (1) Sellers and McGee,[6] as Federated stockholders, removed the current directors and elected Sellers as the new directors; (2) the new Federated directors removed the current officers and elected Brown and Arimizu as the new officers; (3) UIIA's current directors were removed and Sellers were elected as the new directors; (4) the new UIIA directors removed the current officers and elected Brown and Arimizu as the new officers and authorized Brown to pay off Federated's loan to Bank; and (5) at each meeting Bank's freezing of UIIA's checking account was "ratified, confirmed and approved."

UIIA's new officers, Brown and Arimizu, then signed three checks made payable to Bank and drawn on the account with Bank. The three checks were made out for (1) $213,709.97 to pay off Federated's loan to Bank, (2) $5,000 for attorney's fees, and (3) $25,086.29, the balance of UIIA's account, for future attorney's fees and costs associated with Federated's loan.

Mop-up actions then commenced. Meetings of Federated and UIIA's stockholders and directors were held and the new Federated and UIIA directors and officers were removed and the previous directors and officers reinstated. All of the foregoing actions on December 30, 1981, were accomplished in about two and one-half hours.

### B. *Post-Complaint Facts*

On January 21, 1982, UIIA filed a four-count complaint against Bank alleging (1) wrongful appropriation of UIIA's checking account, (2) wrongful dishonoring of checks drawn on the account by UIIA, (3) wrongful conversion of UIIA funds, and (4) "knowing, willful, intentional, malicious, and in conscious and/or reckless disregard of the rights of [UIIA]." UIIA sought injunctive relief, general and punitive damages, costs, interest, and attorney's fees.

On April 18, 1983, the circuit court granted Bank's motion for summary judgment. Thereafter, UIIA timely appealed.

---

[6]The minutes indicated that McGee was a stockholder. However, the December 5, 1980 Stock Purchase Agreement did not list McGee as a stockholder. *See* note 2, *supra.*

On April 29, 1985, Mario R. Ramil,[7] Receiver of Financial Security Insurance Company, Limited (FSIC) (Receiver), filed an application for leave to intervene on appeal. Receiver alleged that as FSIC's "sister corporation," UIIA mainly sold FSIC insurance policies, that UIIA collected the premiums due on FSIC insurance policies and held them in bank accounts before remitting them to FSIC, and that the funds in UIIA's checking account paid over to Bank on December 30, 1981, did not belong to UIIA but were being held in trust for FSIC. Despite Bank's objection, on May 10, 1985, the supreme court permitted Receiver to intervene and directed the parties to file position briefs.

In his position brief, Receiver asserts that (1) as between UIIA and Bank, the former should prevail, (2) even if Bank prevails over UIIA, Receiver has the superior claim to the funds over Bank or UIIA, and (3) the case should be remanded to the trial court for further proceedings and factual findings regarding Receiver's claim.

## II. RIGHT TO VOTE FEDERATED STOCK

Bank effected the repayment of its loan to Federated on December 30, 1981, by having Sellers vote the Federated shares of stock and thereby authorize the use of UIIA's assets for such purpose.[8] UIIA contends that Sellers had no right to vote the Federated stock after they had sold and transferred their entire interest in the stock. Bank argues, however, that because Purchaser never took "delivery" of the Federated stock, it did not acquire the rights as a Federated stockholder and Sellers

---

[7]Mario R. Ramil is the Insurance Commissioner of the State of Hawaii. On October 2, 1984, the First Circuit Court appointed him Receiver of Financial Security Insurance Company, Limited in Civil No. 84-0807.

[8]When deposed, McGee testified as follows:
Q. Then did he [Bank's attorney] say anything about what was going to happen?
A. Yes.
Q. What did he say?
A. I cannot be specific, but basically what I recall was that there was going to be a meeting of the stockholders of Federated Insurance Agency.
The stockholders would elect a new Board for Federated. The Board would elect new officers. The new officers would authorize payment of the loan to the bank. The officers would then resign. The Board would then resign and put back in control of the Board of Directors whoever was in an hour before, who they didn't know who it was.
Transcript of Charles McGee Deposition at 86-87.

retained the voting rights which they lawfully exercised on December 30, 1981.

We hold that the evidence in the record is insufficient to determine whether Sellers or Purchaser had the voting rights to the Federated stock.

### A. *Applicable Law*

We must initially determine what law is applicable in this case.

Ostensibly, Article 8 of the Hawaii Uniform Commercial Code, Hawaii Revised Statutes (HRS) §§ 490:8-101, *et seq.*, dealing with investment securities, is the applicable law. However, citing *Zamore v. Whitten,* 395 A.2d 435 (Me. 1978), UIIA claims the Federated stock is not a "security" within the meaning of HRS § 490:8-102(1)(a) (1976)[9] and, consequently, Article 8 is not applicable. We disagree.

In *Zamore,* the court held that capital stock in a close family business was not of a type "'commonly dealt in upon securities exchanges or markets'" nor "commonly recognized . . . as a medium for investment[,]" 395 A.2d at 441, as required by Uniform Commercial Code (UCC) § 8-102(1)(a)(ii). UIIA argues that Federated is a closely held corporation and likewise doesn't meet the HRS § 490:8-102(1)(a)(ii) test.

We do not choose to follow *Zamore.* The wording of UCC § 8-102(1)(a)(ii) remains virtually the same in its 1977 revision. The 1977 Official Comment to UCC § 8-102 states:

Interests such as the stock of closely-held corporations, although

---

[9] Hawaii Revised Statutes (HRS) § 490:8-102(1)(a) (1976) provides:

(1) In this Article unless the context otherwise requires

(a) A "security" is an instrument which

(i) Is issued in bearer or registered form; and

(ii) Is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) Is either one of a class or series or by its terms is divisible into a class or series of instruments; and

(iv) Evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

Uniform Commercial Code (UCC) § 8-102 was revised in 1977, but Hawaii has not adopted the revised section.

they are not actually traded upon securities exchanges, are intended to be included within the definitions of both certificated and uncertificated securities by the inclusion of interests "of a type" commonly traded in those markets.

2A U.L.A. 221 (Supp. 1985). We will follow other jurisdictions that have adopted this construction. *See Katz v. Abrams,* 549 F. Supp. 668 (E.D. Pa. 1982) (construing Pennsylvania statute); *Wamser v. Bamberger,* 101 Wis.2d 637, 305 N.W.2d 158 (1981); *Gross v. Vogel,* 81 A.D.2d 576, 437 N.Y.S.2d 431 (1981) (citing *Pantel v. Becker,* 89 Misc. 2d 239, 391 N.Y.S.2d 325 (1977)).

Accordingly, we hold that the Federated stock is a "security" within the meaning of HRS § 490:8-102(1)(a) and the applicable law is Article 8 of the Hawaii UCC, as supplemented by Hawaii's corporation and other laws dealing with corporate stock and stockholders. *See* 15A Am. Jur. 2d *Commercial Code* § 73 (1976).

### B. *Pledgee vis-a-vis Purchaser*

A pledge of capital stock is a secured transaction governed by Article 9 of Hawaii UCC, HRS §§ 490:9-101, *et seq.* [10] Thus, as pledgee of the Federated stock, Bank's rights were governed by the provisions of the collateral pledge agreements and Article 9.

Paragraph 13 of the pledge agreements precluded and invalidated any sale of the pledged Federated stock and made such sale a default of the underlying loan. However, the sale of the Federated stock by Sellers to Purchaser could not be a nullity because HRS § 490:9-311 (1976) provides:

The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default.

---

[10] HRS § 490:9-105(1)(j) (Supp. 1984) defines "instrument" to include "security" as defined in HRS § 490:8-102 and HRS § 490:9-304(1) (Supp. 1984) provides that generally a security interest in "instruments . . . can be perfected only by the secured party's taking possession[.]"

Although HRS § 490:9-311 permits a debtor to sell and transfer his interest in collateral, it "does *not* serve to avoid a contract provision making an unconsented transfer of the collateral a default." *Brummund v. First National Bank of Clovis*, 99 N.M. 221, 223, 656 P.2d 884, 886 (1983) (emphasis in original). *See also Poydan, Inc. v. Agia Kiriaki, Inc.*, 130 N.J. Super. 141, 325 A.2d 838 (1974), *aff'd*, 139 N.J. Super. 365, 354 A.2d 99 (1976). Thus, Bank rightfully could and did accelerate the entire balance of the underlying loan.[11] Thereafter, Bank had the right to sell the pledged Federated stock in accordance with paragraph 11 of the pledge agreements and HRS § 490:9-504 (1976 and Supp. 1984). However, it did not do so.

### C. *Sellers vis-a-vis Purchaser*

Bank contends (1) Purchaser never took delivery of the Federated stock as required by HRS § 490:8-301 (1976);[12] (2) Purchaser therefore never acquired legal title to the stock; and (3) consequently, Sellers retained the voting rights of the stock. Bank's reasoning is flawed.

Hawaii UCC Article 8 "may be likened . . . to a negotiable instru-

---

[11] Citing *Fidelity & Casualty Co. of New York v. Key Biscayne Bank*, 501 F.2d 1322 (5th Cir. 1974), Bank stresses the fact that it enjoyed the status of a "bona fide purchaser (BFP)" within the meaning of Hawaii UCC Article 8 regarding the Federated stock. Bank's status is neither at issue nor relevant. In *Key Biscayne Bank*, the pledgee bank was charged with conversion of the pledged shares of IBM stock, so its status as a BFP was crucial. Here, UIIA has charged Bank with misappropriation or conversion of its funds, not the conversion of the Federated stock.

[12] HRS § 490:8-301 (1976) provides:

Rights acquired by purchaser; "adverse claim"; title acquired by bona fide purchaser. (1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. "Adverse claim" includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.

(2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim.

(3) A purchaser of a limited interest acquires rights only to the extent of the interest purchased.

HRS § 490:8-313 (1976) specifies when delivery to the purchaser occurs.

Hawaii has not adopted the 1977 revisions to UCC §§ 8-301 and -313.

ments law dealing with securities." Comments to HRS § 490:8-101. "Its basic purpose is to endow instruments within its scope with the attributes of negotiability." 15A Am. Jur. 2d *Commercial Code* § 73 at 522 (1976). Thus, the Article 8 sections dealing with transfer of securities generally involve "the legal title only and [do] not embrace the broad field of equitable rights and interests and the methods of their transfer." *Phillips v. Zimring,* 284 So.2d 233, 235 (Fla. App. 1973).

Consequently, "[a]s between transferor and transferee, it seems to be the rule that transfer of title may take place though there is no delivery of the certificates themselves, nor endorsement of them, nor transfer of them on the books of the corporation, and even though the sale be by parol." *Estate of Bridges v. Mosebrook,* 662 S.W.2d 116, 120 (Tex. App. 1983) (quoting *Greenspun v. Greenspun,* 194 S.W.2d 134, 137 (Tex. Civ. App.), *aff'd,* 145 Tex. 374, 198 S.W.2d 82 (1946)). As between a transferor and a transferee, an unregistered transfer gives the transferee a "perfect equitable title." 12 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5497 at 436 (rev. perm. ed. 1985).

Accordingly, contrary to Bank's assertion, upon the February 25, 1981 closing of the Agreement, Purchaser acquired Sellers' interest in the Federated stock.

### D. *Issuer vis-a-vis Purchaser*

Generally, the registered owner of stock as shown on the issuer corporation's books is entitled to vote the stock. *Canario v. Serrao,* 11 Haw. 277 (1898).[13] HRS § 490:8-207(1) (1976) provides that prior to the registration of a transfer of a security, the issuer "may treat the registered owner as the person exclusively entitled to vote[.]" Bank argues that because, at best, Purchaser acquired an equitable, but not the legal, interest in the Federated stock, Sellers, rather than Purchaser, had the right to vote the stock.[14]

---

[13]Usually the corporate bylaws will specify who will have the right to vote at meetings. The record of this case does not include the bylaws of Federated.   ·

[14]Bank cites *Norton v. Digital Applications, Inc.,* 305 A.2d 656 (Del. 1973) for the proposition that voting rights are "an incident of *legal* ownership" which does not pass until stock is delivered. Thus, "Keller never having taken delivery of the Federated stock

However, Comment 3 to HRS § 490:8-207 states:

This section does not operate to determine who is finally entitled to exercise voting and other rights or to receive payments and distributions. The parties are still free to incorporate their own arrangements as to these matters in seller-purchaser agreements which will be definitive as between them.

In *In re Wallace A. Erickson & Co.*, 44 B.R. 163, 166 (Bankr. N.D. Ill. 1984), the court stated that "voting rights in stock may be determined by factors other than *pro forma* record ownership of stock," and held that the equitable owner had the right to vote the stock. *See also McLaney v. Fortune Operating Co.*, 84 Nev. 491, 444 P.2d 505 (1968).

The crucial factual question here is whether Sellers sold and transferred to Purchaser all of their interest in the Federated stock, including the voting rights, or whether Sellers retained those rights pending the liquidation of Bank's loan. The resolution of this issue will resolve the question whether Sellers or Purchaser had the right to vote the Federated stock on December 30, 1981.

Unfortunately, the Purchase Agreement is silent concerning the voting rights. Therefore, whether the voting rights were transferred or retained by Sellers is dependent upon the intent of the parties to be gleaned from other evidence in the record. *Urban Research Studies & Development, Ltd. v. Teruya & Sons, Ltd.*, 3 Haw. App. 5, 639 P.2d 1115 (1982).

Viewing the evidence and the reasonable inferences therefrom in the light most favorable to UIIA, *Kang v. Charles Pankow Associates*, 5 Haw. App. 1, 675 P.2d 803 (1984), there exists a genuine issue of material fact as to Sellers' and Purchaser's intention. In the pledge agreements, Sellers retained the right to vote the pledged stock subject to the execution of proxies in favor of Bank upon its request. In the Purchase Agreement, Sellers agreed that at the closing Purchasers will acquire "full title" to the pledged Federated stock. In his deposition, Harris testified to his belief that upon transferring his stock to Pur-

---

. never had the right to vote[.]"

A close review of *Norton*, however, indicates that the court's primary focus was on the "intent" of the parties to confer voting rights rather than the technical aspects of delivery. Looking at the terms of the escrow agreement and other evidence, the *Norton* court concluded that "[i]t is unrealistic to say that the parties intended that [plaintiff] should have the right to vote shares under these circumstances[.]" *Norton*, 305 A.2d at 660.

chaser, he would no longer be a Federated stockholder.[15] From the foregoing, it is not unreasonable to infer that Sellers intended to sell and transfer their entire interest in the Federated stock, including the voting rights.

### E. *Conclusion*

The granting of summary judgment is proper only when, based on the record, there are no genuine issues of material fact and the movant clearly demonstrates he is entitled to a judgment as a matter of law. *Hulsman v. Hemmeter Development Corp.*, 65 Haw. 58, 647 P.2d 713 (1982); *Soukop v. Snyder,* 6 Haw. App. ___, 709 P.2d 109 (1985).

Here, the merits of the case turn on whether Sellers had the right to vote the Federated stock, for if Sellers had no such right, their actions on December 30, 1981, regarding the affairs of Federated and UIIA would have been invalid, null and void. The determination of this question hinges on whether Sellers intended to transfer or retain the voting rights when the pledged Federated shares were sold and transferred to Purchaser. As discussed above, there exists a genuine dispute on this factual issue and, consequently, Bank has not demonstrated that it is entitled to a summary judgment.

---

[15]During his deposition, Harris testified as follows:

Q. What was your understanding as to the effect of the closing; did you think that you were selling all your stock in Federated to Mr. Keller?

A. That's right.

Q. You believed that after closing you were no longer a shareholder of Federated; is that correct?

A. That's correct.

Q. And you understand that Mr. Brown and Mr. Arimizu were also transferring their stock to Mr. Keller and would no longer be shareholders; is that correct?

A. That's correct.

* * *

Q. It is my understanding that you testified this morning that you regarded yourself after the closing with Mr. Keller in February of 1981 as no longer being a stockholder. How, then, could you or did you think about it at all being odd that you were voting stock that you thought you had sold several months earlier? Did that ever cross your mind?

A. Yes, it did[.]

Transcript of Arthur E. Harris Deposition at 64, 121-22.

Therefore, we must reverse the summary judgment and remand the case.

## III. THE RECEIVER'S INTERVENTION

The reversal of the summary judgment and remanding of the case for further proceedings blunt Bank's objection to Receiver's intervention on the grounds of delay and prejudice.

Since Receiver's alleged claim is directed to the funds in UIIA's checking account that Bank allegedly appropriated, judicial economy decrees that both matters be adjudicated in the same proceeding. We therefore direct that upon remand of this case, Receiver file and serve his "Intervenor's Answer to Complaint, Counterclaim, and Cross-Claim." The case may thereafter proceed in accordance with all procedural requirements under the Hawaii Rules of Civil Procedure.

## IV. DISPOSITION

The summary judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*James P. Dandar* (*Gary Y. Shigemura* and *Randall Y.C. Ching* with him on the briefs; *Shigemura & Ching,* A Law Corporation, of counsel) for plaintiff-appellant.

*Steven H. Levinson* (*Denis C.H. Leong* with him on the brief and position brief; *Damon, Key, Char & Bocken,* Attorneys at Law, A Law Corporation, of counsel) for defendant-appellee.

*Don Jeffrey Gelber* (*Robert J. Faris* with him on the position brief; *Gelber & Gelber,* Attorneys at Law, A Law Corporation, of counsel) for intervenor on appeal.