PRODUCTION CREDIT ASSOCIATION OF CHIPPEWA FALLS, Appellant, v. EQUITY COOP LIVESTOCK SALES ASSOCIATION, Respondent.

*No. 75–622. Submitted on briefs December 1, 1977.—Decided January 3, 1978.*
(Also reported in 261 N.W.2d 127.)

For the appellant the cause was submitted on the brief of *Vance L. Sinclair*, attorney, of Chippewa Falls, and *Ross & Stevens, S. C.*, of counsel, of Madison.

For the respondent the cause was submitted on the brief of *Axley, Brynelson, Herrick & Gehl* of Madison.

ABRAHAMSON, J. The issue on appeal is whether a livestock auctioneer may be held liable in conversion for selling a farmer's cattle and paying the proceeds of the sale to the farmer when the cattle are subject to a third party's security interest.

The facts were stipulated. Production Credit Association of Chippewa Falls (PCA) made a loan to Dennis and Julie Johnson on or about March 6, 1972,[1] for use in the Johnsons' dairy farming operation. To secure the loan, the Johnsons entered into a security agreement with PCA. Under the agreement, PCA took a security interest in the Johnsons' cattle herd,[2] feed, specified farm machinery and equipment, and in "all proceeds of the sale or other disposition of any of the property described." The security agreement did not explicitly permit or prohibit the sale of the collateral.[3] A financing statement was filed with the Register of Deeds of Chippewa County.

---

[1] The record does not include a copy of the promissory note given by the Johnsons to PCA.

[2] The Schedule of Property covered by the agreement states that it covers "all [livestock] now owned and hereafter acquired including but not limited to the following: 45 cows; 15 Hfrs. 2 yr.; 12 Hfrs. 1 yr.; 17 calves; 1 bull."

[3] The copy of the security agreement included in the record provides that the "agreement is subject to the terms printed on the reverse side hereof, which are made a part hereof." However, the additional terms, if any, were not made a part of the record and are not before us on review.

Equity Coop Livestock Sales Association (Equity) is a livestock auctioneer. Between April 11, 1972, and April 8, 1974, the Johnsons sold 21 head of cattle through auctions conducted by Equity. Equity deducted its service charges and commission, $116.97, and paid the rest of the sales price, $3,002.46, to the Johnsons.

The trial court found that Equity did not buy the livestock. It functioned only as an auctioneer and clerk.

The Johnsons apparently defaulted on their loan payments, and on November 4, 1974, a judgment was entered against the Johnsons in favor of PCA in the amount of $11,964.94, with costs. The Johnsons did not pay any part of the judgment, and PCA brought an action against Equity to recover the damage sustained by PCA due to what it views as Equity's participation in the Johnsons' conversion of the collateral.

The trial court dismissed PCA's complaint on the merits. We affirm the judgment.

PCA argues that in the instant case the debtors have no right to sell the collateral subject to its security interest. Arguing that a debtor who sells secured collateral without explicit permission commits a wrong for which all participants in the sale must answer, PCA seeks to hold Equity liable for conversion. By the weight of authority an agent such as Equity[4] may be liable for conversion if the principal engaged in a wrongful act. The agent's good faith and lack of knowledge of the security interest are not good defenses.[5] On the record

---

[4] The auctioneer is the seller's agent. *Faultersack v. Clintonville Sales Corp.*, 253 Wis. 432, 435, 34 N.W.2d 682 (1948).

[5] Courts in numerous jurisdictions, applying both federal common law and state common law, have held that an auctioneer may be held liable in conversion for the sale of personal property in which another holds a security interest. Annot., *Personal Liability*

before us, Equity can be held liable for conversion only if the Johnsons had no right to sell the collateral. Thus it is the Johnsons' right to sell the cattle which must concern us. The tort law of conversion and chapter 409, Stats. (Article 9 of the Uniform Commercial Code) [6] are applicable to this issue.

of Auctioneer to Owner or Mortgagee for Conversion, 96 ALR2d 199 (1964). See, e.g., United States v. Carson, 372 F.2d 429, 435 (6th Cir. 1967) and United States v. Matthews, 244 F.2d 626 (9th Cir. 1957) applying federal common law; United States v. Union Livestock Sales Co., 298 F.2d 755 (4th Cir. 1962) applying state law; and United States v. Topeka Livestock Auction, Inc., 392 F. Supp. 944, 948 (N.D. Ind. 1975), in which the court noted that the auctioneer would be liable under either Indiana law or federal common law. Cf. United States v. McCleskey Mills Inc., 409 F.2d 1216 (5th Cir. 1969) (involving an agent which was the buyer, as well as auctioneer).

As Professor Skilton states: "Auctioneer's role as a mere agent or conduit may stir sympathy—it may seem harsh to impose liability for unknowingly aiding the conversion. However, decisions are running against him." Skilton, Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code (and Related Matters), 1974 Wis. L. Rev. 1, 71.

The justification generally given for imposing liability on the auctioneer is that he can more easily search the records for security agreements covering the cattle to be sold than can the buyers at auction. Imposing liability on the auctioneer, as well as on the seller and on the buyer, provides greater protection for secured creditors. See Note, Commercial Law—Uniform Commercial Code—Security Interests in Livestock, 8 Nat. Resources J. 183, 189 (1968). See also Note, Conversion-Liability of an Auctioneer for Sale of Stolen or Mortgaged Chattels, 41 Neb. L. Rev. 617 (1962); Note, Conversion: Liability of Innocent Bailee, Agent, or Servant in Commercial Transaction, 45 Calif. L. Rev. 776 (1957).

[6] Skilton, note 5 supra, at p. 67; United States v. Hext, 444 F.2d 804, 811 n. 21, 9 UCC Rep. Serv. 321, 322 n. 21 (5th Cir. 1971); United States v. McClesky Mills, Inc., 409 F.2d 1216, 1219, 6 UCC Rep. Serv. 273, 276 (5th Cir. 1969); Uniform Commercial Code, sec. 9–306, Comment 3, quoted in note 16 infra.

Prosser describes conversion as "a fascinating tort . . . highly technical in its rules and complications, perhaps more so than any other except defamation, it almost defies definition."[7] Conversion is often defined as the wrongful exercise of dominion or control over a chattel.[8] It may be committed in a variety of ways, the most common being an unauthorized transfer of the goods to one who is not entitled to them. An action for conversion is bottomed upon a tortious interference with possessory rights. The plaintiff in a conversion suit, here PCA, must allege and prove either that it was in possession of the chattel at the time of the conversion or that it was entitled to immediate possession.[9]

PCA was not in possession of the cattle at the time of the sale; the Johnsons or Equity had possession. The question thus becomes whether PCA was entitled to immediate possession. PCA was entitled to immediate possession if the Johnsons were in default.[10] Sec. 409.-

[7] Prosser, Law of Torts, 79 (4th ed. 1971). *See also* Prosser, *The Nature of Conversion*, 42 Corn. L. Q. 168 (1957).

[8] This court has defined conversion as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein, such as a tortious taking of another's chattels, or any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of the possession, permanently or for an indefinite time." *Heuer v. Wiese*, 265 Wis. 6, 8, 60 N.W.2d 385 (1953), quoting *Adams v. Maxcy*, 214 Wis. 240, 245, 252 N.W. 598 (1934).

[9] *Holleb Liquor Distributors, Inc. v. Lincoln Fireproof Warehouse Co.*, 223 Wis. 231, 234, 270 N.W. 545 (1936); *United States v. Sommerville*, 324 F.2d 712, 719 (3d Cir. 1963) (Steel, J., concurring); Prosser, *Law of Torts*, 94–95 (4th ed. 1971); Harper and James, *The Law of Torts*, secs. 2, 8, p. 117 (1956); Skilton, note 5 *supra*, at pp. 67–68.

[10] Or the security agreement may give the secured party possession prior to default. Skilton, note 5 *supra*, at p. 68.

503, Stats., provides that "unless otherwise agreed, a secured party has on default the right to take possession of the collateral."[11]

As noted previously, the event and date of the Johnsons' default are not included in the record,[12] except that the brief of PCA states that "By November 4, 1974, the Johnsons had defaulted in the payment of the PCA loan."

PCA's contention that Equity is a converter assumes that the Johnsons were in default at the time of each sale by Equity, because the mere sale constituted the default. If the Johnsons were in default, PCA was entitled to immediate possession; if, however, the Johnsons were not in default, PCA had no right to possession and thus no basis for a suit in conversion.[13]

---

[11] *See also* sec. 409.501, Stats., relating to default.

[12] According to the facts stipulated, the first sale occurred about five weeks after the loan was made. The last sale occurred seven months before the judgment was entered against the Johnsons on the security agreement.

It is possible that there had been a default prior to some of the sales, but unlikely that there was a default before the first sale. However, the time of default is not specified in the record and no allegation regarding default was made.

[13] PCA's argument can also be interpreted as ignoring the "antique technicality" that conversion is an interference with possession and viewing conversion as any significant wrongful interference with its rights in the property which justifies a suit to recover full value of the property. Prosser, *Law of Torts*, 96–97 (4th ed. 1972). *See also* Skilton, note 5 *supra*, at pp. 68–69; Justice, *Secured Parties and Judgment Creditors—The Courts and Section 9–311 of The Uniform Commercial Code*, 30 Business Law 433, 438 (1975), criticizing the emphasis on "possession" in cases involving the transfer of the collateral. The question then becomes whether the sale constituted a significant wrongful interference with the rights of PCA. Because we hold that the sale was not wrongful, our discussion of sec. 409.311, Stats., meets this interpretation of PCA's position as well.

The security agreement does not attempt to prohibit the sale of the mortgaged property. Nor does the agreement provide that the sale of the collateral constitutes a default.[14]

[14] Under the Uniform Commercial Code, the parties to an agreement have considerable freedom in defining what will constitute default. See Davenport, *Default, Enforcement and Remedies Under Revised Article 9 of the Uniform Commercial Code*, 7 Valparaiso U. L. Rev. 265, 270 (1973); Hogan, *The Secured Party and Default Proceedings Under the UCC*, 47 Minn. L. Rev. 205, 209 (1965); Henson, *Secured Transactions* 236 (1973).

Security agreements which cover livestock typically include the borrower's promise that the livestock will not be sold or transferred unless the secured party has given written consent. See Note, *Commercial Law—Uniform Commercial Code—Security Interests in Livestock*, 8 Nat. Resources J. 183 (1968); 5A Bender's Uniform Commercial Code Services, Form 9-1, Clause III, B, 2, a; sec. 92.26; Skilton, note 5 *supra*, at p. 70 n. 172; *United States v. Carson*, 372 F.2d 429, 431 (6th Cir. 1967); *United States v. Matthews*, 244 F.2d 626, 628 (9th Cir. 1957); *Colorado Bank and Trust Co. v. Western Slope Investments, Inc.*, Colo. App., 539 P.2d 501, 503 (1975); *Wisdom v. Keithley*, 237 Mo. App. 76, 167 S.W.2d 450, 457 (1943); *State Securities Co. v. Svoboda*, 172 Neb. 526, 110 N.W.2d 109, 114 (1961); and *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726, 728 (1967).

The validity of an agreement making a sale of the chattel a default is a subject of debate. See, e.g., Hogan, *Pitfalls in Default Procedure*, 2 UCC L.J. 244, 246, 247 (1970) (notes omitted):

"One of the troublesome areas in the statute is Section 9-311, which seems to say that the debtor has a right to transfer his interest in the collateral, and it seems to be an unrestricted right to transfer his interest in the collateral. That raises a question. Suppose in the security agreement, as you should, you have said that a default occurs if the debtor sells the collateral. If you have as collateral anything that is not inventory, you want that kind of protection in the definition of default in your security agreement.

"Some people have suggested that Section 9-311 prohibits you from using a transfer of the collateral as the basis of a default. I think that thus far neither the statute nor the cases support

Under the Uniform Commercial Code, a debtor's transfer of property which is subject to a security interest is not wrongful in itself and the transfer does not result in automatic default.

"The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default." Sec. 409.311, Stats.

The official Uniform Commercial Code Comment states that the purpose of sec. 409.311, Stats. is "to make clear that in all security transactions under this Article [9], the debtor has an interest (whether legal title or an equity) which he can dispose of and which his creditors can reach."[15]

The debtor's sale of the property does not, however, destroy or affect the continuing validity of the original security interest. The Code protects a secured party by providing that:

"Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the

that conclusion. Section 9–311 merely preserves the interest of the transferee. If the debtor sells the car, the transferee gets whatever the debtor had. Yet the sale can still be a default, and the buyer of that asset takes subject to the secured claim created by the debtor, and the buyer's ability to keep the assets would be subject to the third party's right to repossess."

*See also* note 15 *infra.*

For a different viewpoint *see* Justice, note 13 *supra.*

[15] *See* Official UCC Comment, Comment 1, sec. 409.311, 40C Wis. Stats. Annot., p. 276; 5A Bender's Uniform Commercial Code Service, sec. 92.26.

disposition was authorized by the secured party in the security agreement or otherwise, and also continues in

> "[Sec. 409.311] declares the alienability or transferability of the debtor's rights in collateral, stating that they may be transferred voluntarily or involuntarily by any procedure or process. The debtor's rights are alienable even though the security agreement prohibits any transfer or specifies that the act of transferring shall constitute a default.[14]"

[14] "Note that Code sec. 9-311 does not preclude a security agreement provision which makes the transfer a default but merely prevents such a provision from having the effect of prohibiting transfer." Anderson, 4 Uniform Commercial Code sec. 9-311:3 (2d ed. 1971).

See also Hogan, *The Secured Party and Default Proceedings Under the UCC*, 47 Minn. L. Rev. 205, 210–211 (1965); *Poydan, Inc. v. Agia Kiriaki, Inc.*, 130 N.J. Super. 141, 325 A.2d 838, 15 UCC Rep. Serv. 739 (1974).

Justice, note 13 *supra*, at pp. 434, 435, explains the purpose of sec. 409.311, Stats., as follows: Section 409.311, Stats., is a compromise balancing the interests of the debtor, the secured party and other creditors of the debtor. Sec. 409.311 could have prohibited the voluntary or involuntary transfer of the debtor's equity in the collateral. This solution would have stifled the ability of the debtor to transfer property and could have insulated the debtor's equity from creditors other than the secured party. At the other extreme, sec. 409.311 could have allowed the debtor to sell the collateral free and clear of the security interest, granting the secured party priority in the distribution of the proceeds. This solution would foster free transferability but at the cost of great interference with the rights and interests of the secured party. Adopting the middle position, sec. 409.311 allows the collateral to be conveyed subject to the security interest. The transfer is thus protected. The debtor and his other creditors may suffer under this compromise because the continuing security interest may depress the sale price. On the other hand, although the secured party retains its rights in the chattel, the secured party may be injured when the debtor loses possession. At the very least the secured party will have the burden of pursuing the collateral in the hands of the purchaser.

any identifiable proceeds including collections received by the debtor." Sec. 409.306 (2), Stats.[16]

Sec. 409.311, Stats., does not appear to have changed the law of Wisconsin.[17] Prior to the adoption of the

---

[16] The official UCC comment to section 9–306 states that, "In most cases where a debtor makes an unauthorized disposition of collateral, the security interest, under prior law and under this Article, continues in the original collateral in the hands of the purchaser or other transferee. That is to say, since the transferee takes subject to the security interest, the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion." Comment 3, sec. 409.306, 40C Wis. Stats. Annot., p. 260.

Neither party contends that the ultimate buyers of the cattle in the case at bar took free of the security lien. Sec. 409.306 states that, except as otherwise provided in ch. 409, a buyer takes subject to the security lien. Sec. 409.307(1) does "otherwise provide," but it is not applicable here. Under sec. 409.307(1), Stats., a buyer in the ordinary course of business takes free of a perfected security interest even when the buyer has actual knowledge of the interest. However, the security interest survives against one who buys farm products from "a person engaged in farming operations." If it is argued that the Johnsons are the sellers—not Equity—then the farm exception applies. If Equity is viewed as the seller and is held not to be "a person engaged in farming operations," then the buyers of the cattle take subject to the security lien under that part of sec. 409.307(1) which states that a buyer in the ordinary course of business "takes free of a security interest *created by his seller*." (Emphasis added.) If Equity is viewed as the seller, Equity did not create the security interest and therefore the buyer takes subject to the security lien. *See United States v. Hext*, 444 F.2d 804, 811, 9 UCC Rep. Serv. 321 (5th Cir. 1971); Skilton, note 5 *supra*, at p. 66.

[17] The Wisconsin Legislative Council—1961 Report to the UCC states that sec. 409.311 "makes clear that the debtor's rights in collateral may be voluntarily or involuntarily transferred notwithstanding contrary terms in the security agreement; this also appears to be present [Wisconsin] law." Sec. 409.311, 40C Wis. Stats. Annot., p. 275.

Code, this court had held that the secured party (chattel mortgagee) could not sue the debtor's transferee in conversion because the debtor could sell chattel which were subject to a chattel mortgage. The security interest survived the sale, and the buyer took the property subject to the security interest.

"[T]he general property and equitable title being in the mortgagor, the latter may sell and convey a good title subject to the mortgage; and . . . the special interest of the mortgagee, until it becomes absolute, may be extinguished by the owner of the general property by payment of the mortgage indebtedness. This is in accordance with the modern rule that for all practical purposes chattel mortgages are mere liens." *Midland National Bank & Trust Company v. Peterson*, 229 Wis. 19, 20, 281 N.W. 683 (1938).[18]

As the *Peterson* case illustrates, prior to enacting the Code Wisconsin recognized the debtor's right to transfer his or her interest.

We interpret the Code as incorporating the rationale of the *Peterson case, i.e.,* that the debtor may sell the collateral; that the debtor's transfer of collateral will not destroy the secured party's interest; and that if the transfer of collateral occurs at a time when the debtor is not in default (and the transfer is not an event of default), the secured creditor has no immediate

---

[18] Prior to the Uniform Commercial Code, some states subscribed to the title theory of chattel mortgages: the mortgagee acquired "title to mortgaged property and a voluntary sale by the mortgagor or a creditor's action against the property was not permitted. Sec. 409.311 "changes those rules by providing that in all security interests the debtor's interest in the collateral remains subject to claims of creditors who take appropriate action. It is left to the law of each state to determine the form of 'appropriate process.'" Official UCC Comment, Comment 2, sec. 409.311, 40C Wis. Stats. Annot., p. 276.

remedy against either the debtor or the transferee.[19] We do not reach the question whether a transfer of collateral which constitutes a default or which occurs after the debtor's default is a conversion, because on the basis of the record before us, the assumption must be that the transfers occurred before default.[20]

[19] On default, the creditor may sue the debtor on the note or repossess the collateral from the transferee. Official UCC Comment, Comment 3, sec. 409.306, 40C Wis. Stats. Annot., p. 260; sec. 409.306(2), Stats.

[20] Courts have differed on this question. *Peterson* involved a sale of the mortgaged property after default by nonpayment. The court held conversion would not lie against the transferee, even after default. The disposition *per se* would not constitute conversion because the secured party's interest survived the sale. Thus the sale was not a sufficient enough invasion of the secured persons' interests to constitute conversion. There was no indication that the collateral had been damaged or had become inaccessible to the secured party. The secured party would bring a replevin action if he were entitled to possession. Justice, note 13 *supra*, at pp. 441, 442.

In *Citizens Bank of Lavaca v. Perrin & Sons, Inc.*, 253 Ark. 639, 488 S.W.2d 14, 11 UCC Rep. Serv. 1064 (1972), the Arkansas Supreme Court held that sec. 409.311 authorized the sale and the sale could not be a conversion, the buyer taking the property subject to the lien. "As far as this record shows, the tractor, in the hands of the attachment vendee, was as fully accessible to [the secured creditor] as it would have been if [the debtor] had sold it directly to that vendee, as he had a right to do." 488 S.W.2d at 15. *Cf. State Securities Co. v. Svoboda*, 172 Neb. 526, 110 N.W.2d 109, 114 (1961) (dissenting opinion).

The transferee's conduct has been held to constitute conversion. Official UCC Comment, Comment 3, sec. 409.306, 40C Wis. Stats. Annot., p. 260. In *Royal Store Fixture Co. v. N. J. Butter Co.*, 114 N.J. Super. 263, 276 A.2d 153, 8 UCC Rep. Serv. 139 (1971), the court, assuming the execution and levy on secured property were valid, held that the removal of the property from the state constituted conversion.

*Cf. Murdock v. Blake*, 26 Utah2d 22, 484 P.2d 164, 169 (1971), where the Utah Supreme Court held that on default the debtor

A situation analogous to that of the instant case was presented to this court in *First National Bank v. Sheriff of Milwaukee County*, 34 Wis.2d 535, 149 N.W.2d 548 (1967). A judgment creditor seized property in which the bank had a security interest. The debtor was not in default on his loan at the time of seizure. The Bank (secured party) sued the judgment creditor in replevin. We found that replevin would not lie against the judgment creditor because the debtor had the right to possession when the property was seized. Relying on sec. 409.311, Stats., we said:

"[W]here, as here, a debtor has the right to possession of the collateral and the sheriff seizes the collateral on execution against him, the secured creditor may not intervene by replevin in an attempt to take possession of the property and prevent the execution sale. Instead, creditors without the right to possession of the goods are protected only by the fact that the execution sale is subject to their interest." *Id.* at 541.

---

lost his rights of possession and right of sale. The secured party could bring an action for conversion against a judgment creditor who levied execution and had the secured property sold.

"The most important remedy available to a secured party is the right to take possession of the collateral following a debtor's default. After default the debtor has lost his right of possession and sale and retains only a contingent right in the surplus, if any, after sale. On default, a secured party is entitled to possession as against a subsequent levying creditor, for a levy cannot void the secured party's right to repossession.

". . .

"One who has possession or an immediate right to possession, such as a chattel mortgagee or conditional seller after default, may maintain an action for conversion against one who has exercised unauthorized acts of dominion over the property of another in exclusion or denial of his rights or inconsistent therewith. . . ."

Justice is critical of the court's reasoning in *Murdock. See* Justice, note 13 *supra*, at pp. 440, 445. *See also* Skilton, note 5 *supra*, at p. 71.

For the reasons set forth above, we hold that there was no conversion.

*By the Court.*—Judgment affirmed.