**UNITED STATES of America, Plaintiff,**

v.

**EQUITY LIVESTOCK AUCTION MARKET, Defendant.**

**Civ. A. No. 83–C–0643.**

United States District Court,
E.D. Wisconsin.

Dec. 15, 1983.

---

Eric J. Klumb, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff.

Randall D. Crocker, Lichtsinn, Haensel, Bastian & Erchul, S.C., Milwaukee, Wis., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

The United States has sued Equity Livestock Auction Market for conversion. The United States alleges that Equity auctioned off 10 head of livestock in violation of a security agreement held by the United States. The livestock allegedly converted were turned over to Equity by Ed and Catherine Schenkenberger, who had borrowed from the Farmers Home Administration and who had offered the livestock as collateral for the loan. Equity has now moved to dismiss the United States' complaint. Because precedent is on all four hooves with this case and clearly supports the United States' position, I deny the motion to dismiss.

Equity acknowledges that the issues raised by this motion have been considered and resolved in other "cattle collateral" litigation which is pending before this court. In *United States v. Holmes & Robinson,* 575 F.Supp. 30 (E.D.Wis.1983), Chief Judge Reynolds denied similar motions to dismiss in a case which is identical to this one. However, Equity urges that it is necessary to reconsider these issues "in light of their impact on the Wisconsin farming industry and practices".

Three issues are raised by the motion: First, Equity insists that relief is not available because the United States never formally demanded that Equity return the collateral. Second, Equity argues that I cannot grant relief until the United States identifies precisely which cattle were converted. Third, Equity argues that it would be unfair to hold Equity liable without first joining the Schenkenbergers—the persons who offered the cattle as collateral for the United States' loan and who turned over the cattle to Equity for auctioning. Chief Judge Reynolds has resolved each of these issues. I elaborate on his opinion only for the benefit of the defendants.

A preliminary issue to be resolved is whether this action is governed by federal common law or, instead, by Wisconsin state law. This issue has not been addressed by

the Court of Appeals for this Circuit. In the one decision cited by Equity, the Court of Appeals for the Eighth Circuit held that state law governs the question whether an auctioneer has converted collateral secured under an FHA loan. In *United States v. Chappell Livestock Auction, Inc,* 523 F.2d 840 (8th Cir.1975), the court offered two reasons for its holding:

(1) To permit federal common law to control would require the displacement of state tort law affecting title to personal property, an issue traditionally left to the states; and (2) Congress, in enacting the Farmers Home Administration Act, did not indicate that uniformity was needed, for no intention to override state law was expressed, even though it must have been aware the laws affecting or protecting title are not identical in all states.

*Id.* at 841. At least four other Circuit Courts of Appeals have come to the opposite conclusion, the conclusion drawn by Judge (now FBI Director) Webster, who dissented from the *Chappell Livestock* decision. That conclusion is based on the prevailing view of federal common law, namely, that federal, not state, law is to be applied in determining the remedies available to the United States for breach of a federal duty. *Id.* at 843. *See United States v. Mitchell,* 666 F.2d 1385 (11th Cir. 1982), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1340 (1983); *United States v. Burnette-Carter Co.,* 575 F.2d 587 (6th Cir.), *cert. denied,* 439 U.S. 996, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978); *United States v. Crittenden,* 563 F.2d 678 (5th Cir.), *vacated on other grounds sub nom. United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1978); *Cassidy Commission Co. v. United States,* 387 F.2d 875 (10th Cir.1967). The Supreme Court has described the terms of this prevailing policy:

The SBA and FHA unquestionably perform federal functions within the meaning of *Clearfield* [*Trust Co. v. United States,* 318 U.S. 363 [63 S.Ct. 573, 87 L.Ed. 838] (1943) ]. Since the agencies derive their authority to effectuate loan transactions from specific Acts of Con-

gress passed in the exercise of a "constitutional function or power," *Clearfield* ... at 366 [63 S.Ct. at 574], their rights, as well, should derive from a federal source. When Government activities "arise from and bear heavily upon a federal ... program," the Constitution and Acts of Congress " 'require' otherwise than that state law govern of its own force." *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 592, 593 [93 S.Ct. 2389, 2396, 2397, 37 L.Ed.2d 187] (1973). In such contexts, federal interests are sufficiently implicated to warrant the protection of federal law.

*United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726–727, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1978) (footnotes omitted). Therefore, I do not believe it would be proper to apply Wisconsin law to the issues raised by Equity's motion.

Furthermore, the federal law-state law controversy will make little difference to the disposition of Equity's motion. As Judge Reynolds pointed out in yet another cattle collateral case, Wisconsin law and federal common law governing an auctioneer's liability to a secured party are the same. *See United States v. Midwest Livestock Producers Cooperative,* 493 F.Supp. 1001, 1003 (E.D.Wis.1980), *citing Production Credit Association of Chippewa Falls v. Equity Coop Livestock Sales,* 82 Wis.2d 5, 8–9, 261 N.W.2d 127 (1978). Apparently, therefore, there is no reason to believe that applying federal common law in Wisconsin "would create a hybrid of federal and state law resulting in substantial and irreparable confusion." Defendant's Brief in Support at 4.

■ Addressing the first issue raised by Equity's motion, neither Wisconsin law nor federal common law require that the United States must first formally demand the return of secured chattel before suing for conversion. *Midwest Livestock* at 1002.

■ In support of its position on this issue, Equity relies on *Production Credit Association of Madison v. Nowatzski,* 90 Wis.2d 344, 354, 280 N.W.2d 118 (1979). Equity's reliance on this case is misplaced.

Justice Heffernan's opinion makes it clear that the formal demand requirement applies only when "there is no wrongful taking and the defendant rightfully comes into possession of the chattels". *Id.* at 354, 280 N.W.2d 118. Equity argues that it did not wrongfully take possession of the livestock because it came into possession of them in the usual and ordinary course of its business. However, it was wrongful to auction the cattle without obtaining the government's written consent, as this violates the security agreement covering the livestock. See Complaint, Ex. B at III. B.(6). As Judge Reynolds wrote in *Midwest Livestock*, "an auctioneer is liable on a theory of tortious conversion for the full market value of livestock sold without the government's consent, even if the auctioneer lacked actual knowledge of the security interest." *Id.* at 1002.

Furthermore, in *Nowatzski*, a formal demand was not only legally required, but also commercially reasonable. *Nowatzski* involved a defendant whose conversion consisted merely of continuing to possess the collateral. In such a case, which is more akin to keeping an overdue library book than it is to giving away the farm, a formal demand makes perfect sense; a formal demand enhances the likelihood that the matter can be resolved without litigation but also serves to put a defendant on notice that litigation may ensue. In Equity's case, a demand requirement is as empty as a formality can be. It makes no commercial sense to demand the return of an item from someone whose only duty is to give things away, not hold them.

The commercial reasons for holding auctioneers liable were further outlined in one portion of *Production Credit of Chippewa Falls, supra.* The court pointed out that an auctioneer is a seller's agent and that an agent's good faith and lack of knowledge of the security interest are *not* good defenses to an action for conversion. It concluded that the auctioneer would be held liable for conversion if the original owners of the livestock had no right to sell the collateral under the security agreement. Then, it added in a footnote:

As Professor Skilton states "auctioneer's role as a mere agent or conduit may stir sympathy—it may seem harsh to impose liability for unknowingly aiding the conversion. However, decisions are running against him." ... The justification generally given for imposing liability on the auctioneer is that he can more easily search the records for security agreements covering the cattle to be sold than can the buyers at auction. Imposing liability on the auctioneer, as well as on the seller and on the buyer, provides greater protection for secured creditors. *Id.* 82 Wis.2d at 8–9 n. 5, 261 N.W.2d 127 (citations omitted). Federal common law surrounding secured transactions involving the federal government has always been developed with general principles of commercial law such as these in mind. Cf. *United States v. Mitchell* at 1389 n. 2. Equity has not offered a single reason, commercial or otherwise, why such an arrangement would devastate the farming industry in Wisconsin.

■ The second issue raised by Equity's motion is whether the action should be dismissed for the United States' failure to identify each of the 10 head of cattle which were allegedly converted. Equity argues that a substantial volume of livestock were auctioned during this period and that it is conceivable that the converted cattle were not covered by the security agreement. Having examined the security agreements which were attached to the United States' complaint, particularly Section II, Item 2 of Exhibits B and C, where the quantity, type, sex, breed, color, and age of each of the livestock secured are given, I find the complaint sufficiently specific to satisfy Rule 8(a), F.R.C.P., and to enable Equity to defend this action. The government need not conjure a name for each Bossy, Bessie and Elsie in which it takes a security interest.

The third issue raised by Equity's motion is whether it is necessary to join the original owners of the cattle, the Schenkenbergers. In a rather self-serving way, Equity argues on behalf of the Schenkenbergers that failing to join them in this action may

expose them in later legal actions to the harsh effects of *res judicata*. Equity also argues that in order to determine its liability, it must first be determined whether the Schenkenbergers were in default. Unless they were in default, the sale of the livestock by the Schenkenbergers to Equity was not wrongful.

■ The *res judicata* argument is meritless because its force applies only to those parties involved in the present action. Nor is it necessary for the Schenkenbergers to be made party to this action in order to determine the legal issue whether they were in default. Indeed, default may not be a difficult proposition for the government to prove, if only because the security agreement clearly prohibited the sale of the collateral "without the prior written consent of Secured Party" (Complaint, Ex. B at III.B.(6)). Complete relief can be accorded without the joinder of the Schenkenbergers.

For all the foregoing reasons, therefore, Equity's motion to dismiss is DENIED.

IT IS FURTHER ORDERED that a status conference be held in this action on January 12, 1984, at 8:30 a.m.