## STATE BANK OF INDEPENDENCE, Plaintiff-Respondent and Cross-Appellant,

v.

## EQUITY LIVESTOCK AUCTION MARKET, Defendant-Appellant and Cross-Respondent.

Court of Appeals

*No. 86–2323. Submitted on briefs June 22, 1987.—Decided October 6, 1987.*

(Also reported in 417 N.W.2d 32.)

For defendant-appellant-cross-respondent, there were briefs by *Randall D. Crocker* and *Michael J. Bennett* of *Lichtsinn, Haensel, Bastian, Erchul & Crocker, S.C.,* of Milwaukee.

For plaintiff-respondent-cross-appellant, there were briefs by *Richard E. Braun* of *Whyte & Hirschboeck, S.C.,* of Milwaukee.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. Equity Livestock Auction Market appeals a summary judgment holding them liable in conversion to the State Bank of Independence for the sum of $26,275.80. Independence cross-appeals a dismissal of its claim for punitive damages. Because conflicting affidavits raise material issues of fact, we reverse the summary judgment for conversion in favor

of the bank and remand for further proceedings. Because Equity's conduct as a matter of law does not reach the level of reckless indifference necessary to invoke punitive damages, we affirm the summary judgment dismissing that portion of the bank's claim.

The bank loaned money to Robert Halama, a dairy farmer, and secured the loans with perfected security agreements covering Halama's cattle. *See* secs. 409.302(1), 409.402, 409.401(1), Stats. The agreement prohibited the sale of collateral unless authorized in writing by the bank, except that Halama could sell "deceased, diseased, and male young dairy cattle in accordance with good farming practice in the ordinary course of farm business."

After the agreements were in effect, Halama sold forty-six head of cattle in twenty-four separate sales through Equity's Altoona auction barn. Equity neither searched for nor discovered the bank's security interest. Halama filed bankruptcy, and the bank sued Equity for conversion seeking both compensatory and punitive damages.

Each of the parties to this action solicited an affidavit from Halama. The first, given to the bank, stated that "[t]he bank did not authorize, in writing or otherwise, the sale of any of the adult cattle (the security agreement allows the sale of male calves without the Bank's permission)." It also stated "[t]he bank did not receive any of the proceeds from the sale of the cattle." The bank also presented evidence that it neither had knowledge of nor received proceeds from the sales.

Halama's second affidavit, given to Equity, stated "[t]hat his practice was to select animals for sale which had something wrong with them, such as mastitis, hoof problems or injured udders so that it

was not economically feasible to keep them because the vet bills would be more than he could afford." It also stated "[t]hat as time went on during the period in question he was less able to bear the financial burden of marginal livestock and had to cull more of his herd because it cost him too much to keep the cows compared to what they were producing."[1]

This case presents the following issues:

(1) May a livestock auctioneer be held liable in conversion for selling a farmer's cattle and paying the proceeds of the sale to the farmer when the cattle are subject to a third party's security interest.

(2) Is there a material issue of fact whether any or all of the sales here were exempt from the bank's security interest under the sale of diseased cattle provisions of the security agreement.

(3) Is there a material issue of fact whether the bank received some of the sale proceeds from Halama, thus reducing its claim for damages.

---

[1]Equity also argues that there is a material issue of fact whether the bank consented to the sales of cattle. Halama's second affidavit states:

> [D]uring the period in question he had contact with James Basolo [of the bank] and let him know that livestock had been sold and that the money was used for a particular purpose, such as buying feed or paying a bill. . . . That he periodically during the period in question discussed his worsening financial condition with James Basolo.

We agree with the bank that Halama's statement, phrased in the past tense, does no more than confirm Basolo's affidavit. Basolo claimed that he had confronted Halama after learning of the sales and was told that the cattle were sold to pay bills. Halama's affidavit does not raise an issue of fact regarding consent. *See Christensen v. Equity Coop Livestock Sale Ass'n,* 134 Wis. 2d 300, 396 N.W.2d 762 (Ct. App. 1986).

(4) If a conversion occurred, is Equity liable for punitive damages.

We conclude that: An auctioneer may be liable for conversion; there remain disputed material issues of fact whether any or all of the sales fell within the diseased cattle provisions of the security agreement but there is no disputed issue whether the bank received any of the sale proceeds; punitive damages are not available here.

In reviewing summary judgments, we employ the same methodology as the trial court. If the pleadings join the issue, we consider the moving party's affidavits. If those affidavits state a prima facie case for relief or prima facie defense, we examine the opposing affidavits to determine whether there are material disputed facts that would justify trial on the merits. *Preloznik v. City of Madison,* 113 Wis. 2d 112, 115–16, 334 N.W.2d 580, 582–83 (Ct. App. 1983).

If the facts are undisputed, we proceed to decide the legal issues. Section 802.09(2), Stats. The moving party has the burden to establish the absence of a genuine issue as to any material fact. *Garrett v. City of New Berlin,* 122 Wis. 2d 223, 228, 362 N.W.2d 137, 140 (1985). Doubts as to the existence of a genuine issue of material fact should be resolved against the party moving for summary judgment. *Id.* Affidavits must be viewed in a light most favorable to the party opposing the motion for summary judgment. *Delmore v. American Family Mut. Ins. Co.,* 118 Wis. 2d 510, 512, 348 N.W.2d 151, 153 (1984). Summary judgment does not authorize a trial by affidavit. *Cirillo v. City of Milwaukee,* 34 Wis. 2d 705, 717, 150 N.W.2d 460, 466 (1967).

781

Wisconsin recognizes that a claim for conversion lies against livestock under the facts of this case. This issue was addressed by our supreme court in *PCA v. Equity Coop Livestock Sales Ass'n*, 82 Wis. 2d 5, 8, 261 N.W.2d 127, 128 (1978): "By the weight of authority an agent such as Equity may be liable for conversion if the principal engaged in a wrongful act. The agent's good faith and lack of knowledge of the security interest are not good defenses." (Footnotes omitted.) The court also noted:

> Courts in numerous jurisdictions, applying both federal common law and state common law, have held that an auctioneer may be held liable in conversion for the sale of personal property in which another holds a security interest.
>
> As Professor Skilton states: "Auctioneer's role as a mere agent or conduit may stir sympathy—it may seem harsh to impose liability for unknowingly aiding the conversion. However, decisions are running against him." Skilton, *Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code (and Related Matters)*, 1974 Wis. L. Rev. 1, 71.
>
> The justification generally given for imposing liability on the auctioneer is that he can more easily search the records for security agreements covering the cattle to be sold than can the buyers at auction. Imposing liability on the auctioneer, as well as on the seller and on the buyer, provides greater protection for secured creditors.

*Id.* at 8–9 n. 5, 261 N.W.2d at 128 n. 5 (citations omitted).

Equity argues that the statement in *PCA* is dictum and should be disregarded. We acknowledge

*PCA* concluded that there was no conversion because the cattle were sold with consent so that the foregoing language from that case may in the strictest sense be dictum. Nevertheless, since that discussion is persuasive on the very point at issue in this case, we apply it here. If the arguments advanced in *PCA* are to be rejected, that decision should originate either in the supreme court or through legislation.[2]

Since we agree with the trial court that the bank established a prima facie case for conversion, we examine Equity's opposing affidavits to determine whether they raise material issues of fact. We conclude that they do. The trial court, in deciding otherwise, reasoned that Halama's second affidavit failed to raise a fact issue whether the cattle were diseased.

The security agreement provided that Halama could sell "deceased, diseased, and male young dairy cattle in accordance with good farming practice in the

---

[2]In support of its argument that conversion should not be available against an auctioneer, Equity relies on several sources to support its position. *See* Uchtman, Bauer & Dudek, *The UCC Farm Products Exception—A Time to Change,* 69 Minn. L. Rev. 1315 (1985); *United States v. Progressive Farmers Mktg. Agency,* 788 F.2d 1327 (8th Cir. 1986); *United States v. Walter Dunlap & Sons, Inc.,* 800 F.2d 1232 (3rd Cir. 1986).

Equity also recites data from the deposition of one of its employees that auction barns and commission merchants, like Equity, handle from 3,000 to 4,000 transactions per week or 600 to 800 each business day. Equity argues that each transaction would require a call to the register of deeds and many follow-up calls to lenders.

Since the Federal Packers and Stockyards Act, 7 U.S.C. sec. 228B (1980), requires that the seller receive payment before the close of the following business day, Equity argues that an investigation of each sale is a practical impossibility.

ordinary course of farm business." The trial court held that Halama's second affidavit lacked both specificity and credibility. The court noted that Halama's second affidavit "set side by side" with testimony of a bank witness rendered Halama's affidavit ineffectual. The bank witness stated that the prices received for the cattle in question were indicative of healthy cattle. The trial court also concluded that since Halama's affidavit did not raise a fact issue concerning diseased cattle, it was unnecessary to address the issue whether the sales were "in accord with good farming practices in the ordinary course of farm business" as required by the contract.

The trial court was not entitled to weigh the conflicting evidence as it would at a trial. Halama's affidavit does not lack sufficient specificity. He made reference to specific health problems such as mastitis, hoof problems, and injured udders. Read in context, the affidavit also made reference to the specific dates between which the various sales took place and, when read in a light most favorable to Equity, *see Delmore,* 118 Wis. 2d at 512, 348 N.W.2d at 153, made sufficient reference to the cattle that were the subject of the lawsuit.

Since Halama's affidavit raises fact issues regarding diseased cattle, further proceedings are also necessary on the issue whether the sales, some or all, were in accord with good farming practices in the ordinary course of farm business as well.

As to the sale proceeds issue, we concur with the trial court that no factual dispute exists whether the bank received any of the sale proceeds. Halama stated unequivocally that the bank did not receive any of the

proceeds. The bank presented evidence in accord. Equity relies solely on the fact that some of its checks paid to Halama were endorsed "Pay to the order of State Bank of Independence." The endorsement is inadequate to prove payment.[3] Having failed to refute the absence of payment established by the bank, Equity is no longer entitled to a trial on that issue.

Finally, we conclude, as did the trial court, that punitive damages are not recoverable. Whether punitive damages are recoverable is a question of law. *Brown v. Maxey,* 124 Wis. 2d 426, 431, 369 N.W.2d 677, 680 (1985). Whether the evidence is sufficient to prove that a wrongdoer's conduct is "outrageous" should be decided by the trial court before submitting the issue of punitive damages to the jury. *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 298, 294 N.W.2d 437, 457 (1980). To recover punitive damages, a plaintiff must prove that a defendant acted maliciously or in willful or reckless disregard of the plaintiff's rights. The burden is to establish the claim by clear, satisfactory, and convincing evidence. *Id.* at 300–01, 294 N.W.2d at 458. Punitive damages may be awarded when the defendant should have known that the conduct creates an unreasonable risk of harm and a strong probability, although not a substantial certainty, that harm will result. *Brown,* 124 Wis. 2d at 433, 369 N.W.2d at 681.

It is unnecessary to proceed to trial in this case to resolve the issue of punitive damages. Equity did not ignore security agreements of which it had actual

---

[3]The bank offers to stipulate "for the purpose of appeal" that the checks were so endorsed so that Halama could deposit the checks in his own personal checking account at the bank. Since the "stipulation" is unilateral, we reject it.

knowledge. Equity checked security interest filings for new customers selling at least four or five cows, as well as for regular customers who sold ten cows or more on any given occasion.

Most important, the harsh results of permitting a conversion action against auctioneers referred to by Professor Skilton in *PCA,* 82 Wis. 2d at 9 n. 5, 261 N.W.2d at 128 n. 5, suggest that punitive damages are inappropriate. We conclude that the judicial control over the issue of punitive damages, discussed in *Wangen,* 97 Wis. 2d at 298–99, 294 N.W.2d at 457, was properly exercised by the trial court here.

*By the Court.*—Judgment affirmed in part, reversed in part, and cause remanded for further proceedings.