1998-NMSC-035

966 P.2d 1172

**CASE CREDIT CORPORATION,**
Plaintiff–Petitioner,

v.

**PORTALES NATIONAL BANK and Jerry L. Morris Custom Combining, Inc., a/k/a J.L. Morris Custom Harvesting, Defendants–Respondents.**

No. 24361.

Supreme Court of New Mexico.

Oct. 6, 1998.

Kim E. Kaufman, Albuquerque, NM, Rowley Law Firm, P.C., Richard F. Rowley, III, Clovis, NM, for Petitioner.

Doerr & Knudson, P.A., Stephen Doerr, Portales, NM, for Respondents.

## OPINION

FRANCHINI, C.J.

{1} This is a secured transactions case. We address a single issue: whether the proceeds of an unauthorized sale of a tractor, in which Petitioner Case Credit Corporation (Case) held a prior security interest, were converted by Respondent Portales National Bank (Bank), which held a junior lien in the same tractor, when the Bank, having come into ownership of the proceeds as payee on the check, disbursed the money to a third party (the debtor). The trial court's ruling that there was no conversion was affirmed by the Court of Appeals in an unpublished opinion. We hold that the trial court erred as a matter of law in failing to conclude, based on its findings, that the Bank's actions constituted conversion. We reverse.

*FACTS*

{2} The following facts are agreed on by the parties. J.L. Morris, the debtor, bought a tractor and executed a security agreement and financing statement securing the unpaid balance owed on the tractor. The security agreement and financing statement were filed in Curry County on July 3, 1991. This created a perfected security interest, which was subsequently assigned to Case, which became the secured party. Later, the debtor executed a security agreement and financing statement in favor of the Bank in the same tractor. The Bank filed appropriately on March 4, 1992, and had a junior security interest in the tractor. This security agreement was signed by Nancy Tivis, vice-president of the Bank. On September 30, 1993, the tractor was sold to one McLaughlin for $40,000. This was an unauthorized sale and constituted a default on the security agreement with Case. The sales transaction was handled by the same Bank, where the debtor maintained an account. A check in the above said amount was made out to the Bank, since it was its practice to have its name put on a check covering a sale of goods in which it had a security interest. The Bank took the check, indorsed it by the name of Nancy Tivis, and deposited it in the debtor's account. The bank did not offset its lien, for reasons which are unclear. The money was paid out of the debtor's account in the normal course of business.

*DISCUSSION*

■ {3} Under NMSA 1978, § 55-9-306 (1961, as amended through 1996), it is clear that Case would have had a continuing security interest in the proceeds had they gone directly into the hands of the debtor. A security interest continues in collateral, notwithstanding its sale, where, as here, the sale was unauthorized. Section 55-9-306(2). The check constituted "cash proceeds" of the collateral, Section 55-9-306(1), which were identifiable as such, Section 55-9-306(3)(b). Furthermore, a filed financing statement covered the original collateral. Therefore, since the security interest in the original collateral was perfected, there would have been a "con-

tinuing perfected security interest" in the proceeds. Section 55-9-306(3).

■ {4} The purpose of filing a security agreement and financing statement is to put third persons on notice of the security interest.

> The underlying purpose of filing financing statements is to provide an opportunity for the debtor's other creditors and transferees to independently ascertain whether the property they will rely on as backup for the payment of claims against the debtor . . . is subject to prior claims.

Arnold B. Cohen, *Guide to Secured Lending Transactions* ¶ 3.03 (1988). An examination of the facts as found by the trial court in the instant case shows that the Bank, when it took a second security interest in the tractor, had actual or constructive notice of Case's prior lien as a matter of law.

{5} The next question is whether a security interest under Section 55-9-306(3) was effective against the Bank as the recipient of the proceeds. The statute does not preclude it, and it is held generally that a junior lienholder who is the distributee of proceeds of a sale may not participate therein until senior lienholders have been paid. *Bank of Danville v. Farmers Nat'l Bank,* 602 S.W.2d 160, 164 (Ky.1980).

■ {6} One conceptual difficulty with this case appears to be the fact that the Bank was serving in two roles with respect to the same collateral. It was a junior secured creditor as well as the bank handling checks for the debtor. In the normal course of banking business, a bank in the latter role would have no obligation to investigate the sale of a tractor with the proceeds coming into the bank into the seller's account. However, a bank in the former role-secured creditor on the tractor, on notice, coming into possession of the proceeds of the sale-would. The Bank already had all the knowledge necessary to require it to allow the first lienholder to be paid.

{7} We find useful the case of *AAA Auto Sales v. Security Federal Savings & Loan* on the subject of how the mechanics of Section 55-9-306 lend themselves to theories of conversion when property is handled to the exclusion of a senior interest. *See* 114 N.M. 761, 763, 845 P.2d 855, 857 (Ct.App.1992). The Court of Appeals in *AAA Auto Sales*

quoted *Harley–Davidson Motor Co. v. Bank of New England—Old Colony, N.A.,* 897 F.2d 611, 617 (1st Cir.1990), with approval in this regard: "[C]ase law from other jurisdictions amply 'supports the proposition that, when a debtor makes an unauthorized sale of collateral, and when that transfer constitutes a default under the terms of a security agreement, the secured party obtains an immediate right to the collateral, permitting him to maintain an action for conversion.' " *AAA Auto Sales v. Security Fed. Sav. & Loan,* 114 N.M. at 763, 845 P.2d at 857.

 {8} Thus, upon an unauthorized sale, the property right of the senior creditor vests *immediately* in the collateral, or in this case, as indicated by *Bank of Danville,* in the proceeds in the hands of a junior secured party. That party, the Bank, did not issue to Case its share of the proceeds. One authority has written, "it seems clear that there are situations in which a wilful omission which deprives the plaintiff of his property can serve as a foundation for the action [of conversion]." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* Ch. 3 § 15 (5th ed.1984). The issue then is whether the acts or omissions of the Bank in this case, given the meaning and intent of Section 55–9–306, constitute the tort of conversion. We hold that they do.

{9} Our holding is logical in light of our own case law as well. We defined conversion in *Apodaca v. Unknown Heirs,* 98 N.M. 620, 624, 651 P.2d 1264, 1268 (1982), as a "wrongful detention amounting to repudiation of the owner's rights or any exercise of dominion inconsistent with such rights." Here, the Bank was on notice that immediately upon default of the debtor, Case's security interest became a possessory right. Detention of the check and then depositing it into the debtor's account amounted to a repudiation of this right. Furthermore, since the check was made out to the Bank (for the very reason that the Bank had a lien on the tractor), it was in the Bank's domain for a period of time and the Bank had ownership of it. The Bank was not in the role of a mere collecting bank, through whose hands the check moved. Rather the check stopped in the hands of the Bank, which had total control over its dispo-

sition. The Bank then acted on the check by indorsing it and giving it in its entirety to the debtor. Our careful definition of conversion does not require any benefit going to the Bank; the above acts alone were illegal acts of dominion inconsistent with Case's rights.

{10} The Bank, for the first time on appeal, raises the argument that it was a holder in due course of the check and therefore took it free of the claim of Case. We do not address this argument in detail since it does not pertain to jurisdiction and since there was no opportunity for necessary factual development or argument before the trial court. *See State ex rel. State Highway Commission v. Pelletier,* 76 N.M. 555, 559, 417 P.2d 46, 48 (1966). We do note that from all the facts and circumstances known to the Bank at the time, it had reason to know of the existence of the fact of Case's claim in the proceeds, apart from and beyond the notice given by the filing of the financing statement. *See* NMSA 1978 § 55–1–201(25) to (27) (1993). Notice of this kind defeats holder in due course status. NMSA 1978 § 55–3–302 (1992).

*CONCLUSION*

{11} Therefore, we reverse the Court of Appeals and remand to the District Court for computation of damages and interest.

{12} **IT IS SO ORDERED.**

BACA, SERNA and McKINNON, JJ., concur.

MINZNER, J., dissenting.

{13} The majority describes conversion "as a 'wrongful detention amounting to repudiation of the owner's rights or an[y] exercise of dominion inconsistent with such rights.' " (quoting *Apodaca v. Unknown Heirs,* 98 N.M. 620, 624, 651 P.2d 1264, 1268 (1982)) (alteration indicating change from *Apodaca* ). The Court of Appeals described the tort as "[']the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made.[']" *Case Credit Corp. v. Portales Nat'l Bank,* No. 17,857, slip op. at

2 (N.M.Ct.App. Apr. 22, 1997) (quoting *Nosker v. Trinity Land Co.,* 107 N.M. 333, 337–38, 757 P.2d 803, 807–08 (Ct.App.1988)). Despite an apparent discrepancy, there is no real difference between these descriptions— *Nosker* defined at least three different types of conversion, focusing on conversion by demand and refusal, *see* 107 N.M. at 337–39, 757 P.2d at 807–09, while *Apodaca* simply acknowledged two ways by which an actor may commit the tort, *see* 98 N.M. at 624, 651 P.2d at 1268; *accord Restatement (Second) of Torts* § 223 (1965) (listing seven ways by which conversion may be committed). Neither *Nosker* nor *Apodaca* purported to provide a comprehensive definition.

{14} I believe that the *Restatement* offers a more comprehensive definition that accounts for the salient features of both *Nosker* and *Apodaca.* Applying the *Restatement*'s analytical framework to the case at bar, I conclude that we should affirm the trial court's ruling in favor of the Bank. Therefore, I respectfully dissent.

## I.

{15} Focusing on, among other things, the *seriousness of interference* and the *justice of result,* the *Restatement* defines conversion as "an intentional exercise of dominion or control over a chattel which so *seriously* interferes with the right of another to control it that the actor may *justly* be required to pay the other the full value of the chattel." *Restatement* § 222A(1) (emphases added). I believe this definition best accords with a conversion claim arising under an alleged abrogation of a security interest. *See* Russell A. Hakes, *A Quest for Justice in the Conversion of Security Interests,* 82 Ky.L.J. 837, 841 (1993–1994) ("An examination of the [*Restatement*'s] justice inquiry, in light of the insights provided by an understanding of the divergent legal frameworks for personal property, suggests modifications to the tort of conversion as applied to security interests.").

{16} The *Restatement* sets forth the following factors to consider "[i]n determining the seriousness of the interference and the justice of [the result]":

(a) the extent and duration of the actor's exercise of dominion or control;

(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) the actor's good faith;

(d) the extent and duration of the resulting interference with the other's right of control;

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

*Restatement* § 222A(2). In my view, factors (a) and (b) are dispositive of this case. The trial court rationally found that the Bank did not exercise dominion or control over the proceeds, and the Bank's intent to assert a right in the proceeds was not inconsistent with any of Case's rights. *See Sosa v. Empire Roofing Co.,* 110 N.M. 614, 616, 798 P.2d 215, 217 (Ct.App.1990) ("[W]hen a finding is made against the party with the burden of proof, we can affirm such a finding if it was rational for the fact finder to disbelieve the evidence offered in support" of that burden.). I conclude that the evidence does not compel different findings and that the findings support judgment in favor of the Bank.

### A. *Exercise of Dominion and Control*

{17} The majority maintains that "[t]he sales transaction was handled by the ... Bank, where the debtor maintained an account." I disagree. Among other things, the trial court found the following: both Case and the Bank had perfected security interests in the tractor, and the Bank's was junior to Case's; before purchasing the tractor from the debtor, the buyer contacted the Bank, whose vice-president informed him that the Bank would release its security interest if the buyer placed the Bank's name on the purchase check; it was the Bank's common practice to have its name placed on purchase checks for equipment in which it held security interests; per the debtor's instructions, the Bank deposited the check into one of the debtor's accounts at the Bank; and the Bank did not benefit from the proceeds. These findings do not support a conclusion that the Bank handled the sales transaction *or* exercised dominion and control; rather, these findings support the no-

tion that the Bank acted in a single, benign role: voluntarily and gratuitously releasing its own security interest.

{18} Several other factors support this latter notion. First, the Bank did not effectuate or intervene in the sale of the tractor; rather, because the buyer of the tractor contacted the Bank and requested the Bank to release its security interest, and because the Bank obliged the buyer in this regard, the Bank's involvement in the sale was, at most, passive and tangential.[1] Second, because the Bank deposited all of the proceeds into the debtor's account, the Bank did not, in any way, participate in the proceeds.[2] Third, the Bank did not close-off effective avenues for Case to protect its interest; Case's interest was continuous, secured, and perfected in both the tractor *and* its proceeds. NMSA 1978, § 55–9–306(2) (1985, prior to 1996 amendment). Finally, because Case could have pursued its interest in the tractor, the Bank did not leave Case with only the proceeds of the sale with which to secure the debtor's original obligation.[3]

{19} Along similar lines, the Court of Appeals concluded that the trial court was not incorrect in finding that the Bank exercised no dominion or control over the proceeds:

> [T]he trial court could have found that depositing the proceeds into the [debtor's] account was not an exercise of dominion. The trial court found that the proceeds in the [debtor's] account were paid out in the normal course of business, and that there was no demonstration that [the Bank] received or benefitted from the proceeds.
>
> The foregoing constitutes substantial evidence that [the Bank] did not exercise dominion over the proceeds. If [the Bank] had exercised dominion, it presumably would not have allowed the proceeds to leave without getting a share. So while receipt of, or benefit from, the proceeds are not themselves elements of conversion, the absence of these is evidence tending to show that there was no exercise of dominion.

*Case Credit*, No. 17,857, slip op. at 2–3.

### B. *Intent to Assert a Right in the Proceeds*

{20} The majority takes the position that, "upon an unauthorized sale, the proper-

---

1. Third parties such as "auctioneers, warehouse-men, commission merchants, etc., who deal with property *as a middleman for and on behalf of and as agent for others* [may be] liable in conversion when they effectuate the sale of property for principals who cannot legally authorize the sale." *Interstate Fin. Co. v. Kansas City Auto. Auction Co.*, 446 S.W.2d 462, 466 (Mo.Ct.App. 1969) (emphasis added); *accord First Nat'l Bank v. Southwestern Livestock, Inc.*, 859 F.2d 847, 850 (10th Cir.1988) (holding a cattle auction-house liable for conversion of a secured party's interest, in spite of the auction-house's lack of actual knowledge of the interest, because the security agreement prohibited the debtor from selling the cattle); *Production Credit Ass'n v. Equity Coop Livestock Sales Ass'n*, 82 Wis.2d 5, 261 N.W.2d 127, 132–33 (Wis.1978) (holding that a livestock auctioneer did not convert a secured party's interest in livestock, because the security agreement did not prohibit the sale of the livestock or provide that such a sale would constitute a default). This is not such a case, because the evidence shows less involvement by the Bank.

2. The majority appears to rely heavily upon *Bank of Danville v. Farmers Nat'l Bank*, 602 S.W.2d 160 (Ky.1980). That case held, however, that the junior secured party "was not entitled to participate in the proceeds of the sale until the [senior party] had been fully paid." *Id.* at 164. Because the *Bank of Danville* court found the junior party to have converted the proceeds by participating

therein—i.e., by paying itself off—the appropriate computation for damages was the *full value* of the proceeds. *See Restatement* § 222A. Thus, the *Bank of Danville* court was correct in holding the junior party liable "not only ... for the [amount it distributed to the debtor and the debtor's creditors] but also for the [amount] which it paid to itself." 602 S.W.2d at 164.

3. Courts have allowed claims for conversion against parties who allegedly (1) effectuate or intervene in sales of original collateral, (2) participate in the proceeds by retaining some or all of the proceeds for themselves, (3) close-off effective and existing avenues for innocent secured parties to continue securing their interests, *and* (4) leave secured parties with only the proceeds of the sales to secure the debtors' original obligations. *See AAA Auto Sales & Rental, Inc. v. Security Fed. Sav. & Loan*, 114 N.M. 761, 763–64, 845 P.2d 855, 857–58 (Ct.App.1992); *Bank of Danville*, 602 S.W.2d at 164; *cf. Harley–Davidson Motor Co. v. Bank of New England—Old Colony, N.A.*, 897 F.2d 611, 616–23 (1st Cir.1990) (reinstating a claim for conversion based on a junior secured party's releasing title certificates to inventory motorcycles in exchange for the proceeds of the sales of the motorcycles by the debtor). The trial court's findings indicate that none of these factors were present.

ty right of the senior creditor vests *immediately* in the collateral, or in this case, ... in the proceeds in the hands of a junior secured party." Taken to its logical conclusion, this assertion would allow for a senior secured party to have an *immediate* double recovery. The Uniform Commercial Code (UCC) precludes such a result. *See* § 55–9–306 official cmt. 3, para. 1 ("[Upon default,] [t]he secured party may claim both proceeds and collateral, *but may of course have only one satisfaction.*" (emphasis added)). The fact that Case could not have been entitled to possess both the tractor and its proceeds accords with the theory, underlying Article 9 of the UCC, that title remains vested in the debtor. *See* NMSA 1978, § 55–9–311 (1961) ("The debtor's rights in collateral may be voluntarily or involuntarily transferred ... *notwithstanding a provision in the security agreement* prohibiting any transfer or making the transfer constitute a default." (emphasis added)); *id.* official cmt. 2 (explaining that, under Section 55–9–311, the debtor keeps title to the collateral, which "remains subject to claims of creditors who take appropriate action"); *see also* Hakes, *supra*, at 907–10, 936 (explaining the lack of a "title theory" in the UCC, and concluding that "Section 9–311 of the U.C.C. should be interpreted to preclude the finding that the mere transfer of collateral or the mere creation or enforcement of a lien or security interest in collateral constitutes wrongful dominion or control over personal property which in turn constitutes conversion"). Because Case did not have a right to immediate possession of the proceeds, the Bank's intent to assert a right in those proceeds—i.e., for the purpose of releasing its own security interest—did not amount to an interference with any of Case's rights. It thus follows that Case lacked any right of control upon which to base its conversion claim. *See Nosker*, 107 N.M. at 339, 757 P.2d at 809 ("[W]here a defendant is rightfully in possession of property, [a] demand [for the property] must be made before the action for conversion is brought.").

{21} Even if we assume that Case had a right to control the proceeds while they were in the hands of the Bank, it is clear that the Bank's interference with these rights was, at most, insignificant. According to a plain reading of the UCC, the Bank's deposit of the entire sum of the proceeds into the debtor's account did *not*, in any way, affect Case's rights thereto; in fact, the UCC ensured that Case's security interest continued in the proceeds *at that very moment. See* § 55–9–306(2) ("[A] security interest ... continues in any identifiable proceeds, including collections, *received by the debtor.*" (emphasis added)). The Court of Appeals came to a similar conclusion:

> Even if [the Bank] exercised dominion in a strict sense, [the Bank] did not do so "in exclusion or defiance" of Case's rights. [The Bank] did nothing with the proceeds after it put them in the [debtor's] account. [The Bank] did nothing to stop Case from getting the proceeds, while Case did nothing to get them. [The debtor] spent the money in the ordinary course of business. Thus, to the extent [the Bank] exercised any dominion over the proceeds, it did not do so in exclusion or defiance of Case's rights.

*Case Credit*, No. 17,857, slip op. at 3 (citations omitted). Because Case's interests remained continuous, secured, and perfected in both the tractor *and* its proceeds, this is not a case where the "intentional exercise of dominion or control over [the] chattel ... so *seriously* interfere[d] with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Restatement* § 222A(1) (emphasis added).

## II.

{22} Because the trial court rationally found that the Bank did not exercise dominion or control over the proceeds, and because the Bank's intent to assert a right in the proceeds was not inconsistent with any of Case's rights, I would affirm the district court and the Court of Appeals. For the foregoing reasons, I respectfully dissent.